2010 Ark. 1

**James Aaron MILLER, Appellant,**

v.

**STATE of Arkansas, Appellee.**

**No. CR 08–1297.**

Supreme Court of Arkansas.

Jan. 7, 2010.

Rehearing Denied Feb. 12, 2010.

---

Montgomery, Adams & Wyatt, PLC, by: Dale E. Adams and James W. Wyatt, Little Rock, for appellant.

Dustin McDaniel, Att'y Gen., by: Brad Newman and Jake H. Jones, Ass't Att'ys Gen., for appellee.

DONALD L. CORBIN, Justice.

⌐This is an automatic appeal pursuant to Ark. R.App. P.-Crim. 10 (2009) from the judgment of the Sebastian County Circuit Court convicting Appellant James Aaron Miller of three counts of capital murder and sentencing him to death on each count. Jurisdiction is properly in this court pursuant to Ark. Sup.Ct. R. 1–2(a)(2) (2009). We find that no error occurred in the guilt phase of the bifurcated trial, and therefore affirm the judgment of convictions for capital murder. We find that reversible error occurred in the penalty phase of the trial, however, when two victim-impact witnesses improperly recommended to the jury that they impose the death penalty. We therefore reverse the death sentences and remand to the trial court for resentencing pursuant to Ark.Code Ann. § 5–4–616 (Repl.2006).

A detailed recitation of the evidence produced at trial is not necessary, as Miller does not challenge the sufficiency of the evidence presented against him. However, the following ⌐₂basic facts and review of the procedural history are helpful to an understanding of the arguments raised in this appeal.

Miller was charged by felony information with the capital murders of his girlfriend Bridgette Barr, her five-year-old daughter Sydney Barr, and her two-year-old son Garrett Barr. The information alleged that the murders occurred on or about December 22, 2006. Police received a request in the early morning hours of December 26, 2006, from Miller's father, who was then out-of-state, to check on Miller because he had threatened to hurt himself. Sometime after police arrived at

the apartment that Miller shared with Ms. Barr, Miller agreed to be transported by ambulance for a mental evaluation. While awaiting transport, Miller admitted to police that he committed the murders. Physical evidence indicated that the murders had occurred some three or four days earlier.

Miller was tried, convicted, and sentenced by a Sebastian County jury during the first week of April 2008. Immediately following the entry of the judgment and commitment order on April 7, 2008, the circuit clerk filed a notice of appeal on Miller's behalf, pursuant to Rule 10. After a partial record was lodged, we granted the motion of Miller's trial counsel to withdraw, and we appointed new counsel for Miller's Rule 10 appeal. *Miller v. State,* CR 08–499, 2008 WL 1970951 (Ark. May 8, 2008) (unpublished per curiam). Miller filed a pro se motion to withdraw his appeal, which we determined to be moot since this court's review of a death sentence is mandatory pursuant to Rule 10. *Miller v. State,* 2009 Ark. 143, 2009 WL 636714 (per curiam) (citing *Newman v. State,* 350 Ark. 51, 84 S.W.3d 443 (2002) (per curiam)).

Miller's Rule 10 counsel enumerates fourteen points for our review in this automatic appeal. Of the fourteen points raised by Miller's Rule 10 counsel, we first address the eight that are alleged to have occurred during the guilt phase of the trial.

### I. *Guilt–Phase Issues*

#### A. *Motion to Suppress*

■ Miller's first assignment of error in the guilt phase is that the trial court erred in denying his motion to suppress evidence seized as a result of the search of his residence, which included all the evidence seized from the crime-scene investigation as well as statements he made subsequent to the search. Miller contends the search of his home was conducted without a warrant, without his consent, and was otherwise unjustifiable under the Fourth Amendment. He further contends his statements should be suppressed as fruit of the poisonous tree.

■ In reviewing a circuit court's denial of a motion to suppress evidence, we conduct a de novo review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the circuit court. *Baird v. State,* 357 Ark. 508, 182 S.W.3d 136 (2004). We reverse only if the ruling is clearly against the preponderance of the evidence. *Wofford v. State,* 330 Ark. 8, 952 S.W.2d 646 (1997).

■ Warrantless searches in private homes are presumptively unreasonable under the Fourth Amendment, and the State bears the burden of proving that the warrantless activity was reasonable. *Baird,* 357 Ark. 508, 182 S.W.3d 136; *Mann v. State,* 357 Ark. 159, 161 S.W.3d 826 (2004). However, law enforcement officers may enter a home without a warrant if the State establishes an exception to the warrant requirement. *Baird,* 357 Ark. 508, 182 S.W.3d 136. One such exception is stated in Ark. R.Crim. P. 14.3 (2009) as follows:

*Rule 14.3 Emergency searches.*

An officer who has reasonable cause to believe that premises or a vehicle contain:

(a) individuals in imminent danger of death or serious bodily harm; or

(b) things imminently likely to burn, explode, or otherwise cause death, serious bodily harm, or substantial destruction of property; or

(c) things subject to seizure which will cause or be used to cause death or serious bodily harm if their seizure is delayed;

may, without a search warrant, enter and search such premises and vehicles, and the persons therein, to the extent reasonably necessary for the prevention of such death, bodily harm, or destruction.

This court applied Rule 14.3(a) and stated that a warrantless entry into a home may be upheld under the emergency exception if the State shows that the intruding officer had reasonable cause to believe that someone inside the home was in imminent danger of death or serious bodily harm. *Wofford*, 330 Ark. 8, 952 S.W.2d 646. This court stated further that any search that follows the emergency entry may be upheld under Rule 14.3 if it was reasonably necessary for the prevention of such death or serious bodily harm and is strictly circumscribed by the exigencies that necessitated the emergency entry in the first place. *Id.* (citing *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)). Police may seize evidence that they observe in plain view while conducting legitimate emergency activities. *Mincey*, 437 U.S. 385, 98 S.Ct. 2408.

In holding as it has regarding exigent circumstances, this court has expressly noted with approval the United States Supreme Court's recognition of the emergency exception to the warrant requirement in its Fourth Amendment jurisprudence. *Steinmetz v. State*, 366 Ark. 222, 234 S.W.3d 302 (2006). The Supreme Court's most recent statements of the emergency exception reiterate that the emergency exception does not depend on the officers' subjective intent or the seriousness of any crime they are investigating, but rather it requires only an objectively reasonable basis for believing that a person within the house is in need of immediate aid. *Michigan v. Fisher*, 558 U.S. ——, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009) (per curiam). Furthermore, though "[o]fficers do not need ironclad proof of 'a likely serious, life-threatening injury' to invoke the emergency aid exception," there must be " 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger." *Id.* at ——, 130 S.Ct. at 549.

Keeping in mind Rule 14.3 and this court's application of that rule, we turn now to the facts surrounding the search in this case. Fort Smith Police Officer Stephen Hutchinson testified at the hearing on the motion to suppress that he was dispatched pursuant to a 911 call from Miller's father, who was in Colorado and had received a text message from Miller stating that Miller was thinking of killing himself with pills. Officer Hutchinson and Officer Derek Harwood went to an apartment rented to Bridgette Barr to conduct a welfare check on Miller. They knocked on the door, and Miller opened it. They explained to Miller that they were there in response to a 911 call from his father about a suicide threat and that they were checking to see how he was doing. Officer Hutchinson asked if they could come inside to talk because it was so cold outside. After first asking to leave immediately with the officers, Miller agreed to let them in the apartment and to wait for an ambulance to take him to the hospital for a mental-health evaluation. While inside the entryway, Officer Hutchinson began to offer help to Miller and to inquire about what kind of problems he was having. Miller stated that he and his girlfriend had been fighting. While this conversation was occurring inside the apartment, Officer Hutchinson noticed pictures of a woman, whom Hutchinson thought to be Miller's girlfriend because he had his arm

around her and two small children. He also noticed a dried blood stain approximately six to eight inches in diameter on the door. Despite having a head cold at the time, Officer Hutchinson also noticed a foul odor in the apartment.

Officer Hutchinson continued his testimony by relating that the ambulance arrived and Miller left the apartment with the Emergency Management Services personnel. While Officer Harwood sought the keys from Miller to lock the apartment, Officer Hutchinson observed that Miller seemed like he did not care whether the apartment was locked. Officer Hutchinson then recalled that Miller was acting suspicious in wanting to leave the apartment so quickly. He also recalled the blood stain on the door and then wondered where the people in the picture were. Accordingly, before locking the door, the officers walked through the apartment to make sure everything was okay. Officer Hutchinson stated that since they were dealing with a suicidal subject, he wanted to make sure they were not leaving something out that a child could use to hurt himself.

In conducting the walk-through of the apartment, the officers saw in plain view a foot with toenails painted red extending from a pile of blankets on the floor at the end of a bed. Officer Hutchinson pulled the blanket back just enough to see the forehead of a body that appeared to be decayed. Both officers then left the apartment, returned to the ambulance outside, and read Miller his *Miranda* rights. Officer Hutchinson then asked Miller if he had killed the person in the bedroom; Miller answered yes. Remembering that he had also seen pictures of two small children, Officer Hutchinson asked Miller where the children in the picture were. Miller stated they were in the house and then admitted to killing the children also.

While Officers Hutchinson and Harwood were talking to Miller, Officer Calvin Treat arrived on the scene and entered the apartment with knowledge that a body had been discovered. He discovered the female victim, Ms. Barr, as well as a female child victim, Sydney, lying next to each other. After determining that both were dead and not in need of aid, he left the apartment. Meanwhile, Miller signed a consent-to-search form. Additional law enforcement officers then entered the apartment and discovered the third body, that of Garrett, in the bathtub.

After hearing the foregoing testimony, the trial court denied the motion to suppress, stating that the observations made by the officers entitled them to look through the apartment before they locked it to make sure there was no one inside who needed attention. This was a credibility determination by the trial court, and we defer to the trial court's superior position to determine the credibility of witnesses who testify at a suppression hearing. *Baird*, 357 Ark. 508, 182 S.W.3d 136. This court has observed that when the police reasonably believe that a victim or occupants of a home are in distress or in need of protection, an emergency entry into a home satisfies the reasonableness requirement of the Fourth Amendment and supplies a compelling reason for immediate entry quite apart from the purpose of prosecuting for crime. *Wofford*, 330 Ark. 8, 952 S.W.2d 646.

We conclude that the preponderance of the evidence supports the trial court's determination, and we cannot say the officers acted unreasonably here. We reject Miller's argument on appeal that once he opened the door to the officers, there was no longer any basis for believing that anyone was in imminent danger. Based on information the officers received when they were dispatched, they knew they

were checking on a suicidal subject at the apartment he shared with his girlfriend. The subject had admitted he and his girlfriend had been fighting. The officers saw a blood stain on the door and smelled a foul odor. The subject was eager to leave the apartment. In addition, the officers saw photographs of the subject with his arm around someone they thought was the subject's girlfriend and two small children. It was certainly reasonable to think the children might be in the home and that the officers should ensure they were not in the home before locking and leaving it. It was likewise reasonable for the officers to ensure that, if the children were not present in the home, no weapons or pills from a suicide attempt or fight between the adults were left accessible to the children. Finally, given the description by the EMS personnel that the odor in the apartment smelled like burned wild game or burned Spam, it was also reasonable for the officers to ensure that there was nothing left in the apartment likely to burn or explode when they locked the door and left. These circumstances are consistent with all the emergencies described in Rule 14.3. Thus, we conclude the initial entry and search of the apartment were in compliance with Rule 14.3.

We further conclude that subsequent actions by these officers were permissible as within the scope of the emergency that justified them. Once an entry is permitted in accordance with Rule 14.3, any subsequent search and seizure is limited to that which is in plain view and observed incident to the entry in response to the emergency. *Hodge v. State*, 332 Ark. 377, 965 S.W.2d 766 (1998). Officer Hutchinson stated he saw the foot extending from the blankets in plain view. Further, Officer Treat's entry into the apartment was permissible, as reports of death can frequently prove inaccurate, and it therefore became incumbent upon Officer Treat to

immediately ascertain the situation and whether there might be some hope that one or more of the victims might still be alive. *Id.*

In summary, based on all the foregoing testimony, we conclude the evidence established that the officers acted reasonably in response to the emergencies and was thus sufficient to overcome the presumption of unreasonableness. We therefore affirm the trial court's denial of the motion to suppress. Because we affirm that the entry and search of the home were valid, we need not address Miller's argument that his statement given while in the ambulance should be suppressed as fruit of the poisonous tree.

## B. *Jury–Selection Process*

Next, Miller contends that he was denied his Sixth and Fourteenth Amendment rights to a fair trial composed of jurors selected from a fair cross section of the community. Although he presents a three-fold argument in his initial brief to support this contention, Miller rephrases this contention in his reply brief into a single issue: whether a court should, in a death penalty case, require that all jurors be brought in for voir dire and not be excluded based on stated scheduling conflicts or on their beliefs about the death penalty. We conclude that no such requirement exists under either state or federal law.

Initially, we note that regardless of how Miller phrases his argument, he has not raised a proper fair cross-section challenge. A fair cross-section claim asserts that a distinctive group in the community was systematically excluded from the jury pool. *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). A group of persons defined solely in terms of shared attitudes that would

prevent or substantially impair their performance of duties as jurors is not considered a distinctive group for fair cross-section purposes. *Id.* Secondly, we note that to the extent that Miller is challenging the death qualification of the jury, the Constitution does not prohibit the states from death-qualifying juries in capital cases. *Id.*

■ In the present case, the focus of Miller's argument is on the questionnaire and the fact that some prospective jurors were excused based on the written answers they gave without ever being required to appear and answer questions from counsel. We are aware that Miller has cited us to case law from other jurisdictions in support of his argument. We are not persuaded by those cases, however, given that Arkansas has applicable law on point.

We begin our analysis of Miller's argument with Rule 32.1 of the Arkansas Rules of Criminal Procedure, which allows a circuit court to use a written questionnaire. Rule 32.1 states in its entirety:

> The circuit court may require members of petit jury panels to complete written questionnaires setting forth the following information:
> (i) age;
> (ii) marital status;
> (iii) extent of education;
> (iv) occupation of juror and spouse; and
> (v) prior jury service.
>
> Upon request, such questionnaires shall be made available by the clerk of the court to the defendant or his counsel and the prosecuting attorney. Upon a showing of good cause, additional information may be furnished regarding jurors by order of the court.

Ark. R.Crim. P. 32.1 (2009). This rule clearly permits the use of an expanded questionnaire. This court has observed that the concept of an expanded questionnaire is merely a written form of voir dire examination and is a matter within the trial court's discretion. *Danzie v. State,* 326 Ark. 34, 930 S.W.2d 310 (1996).

Our analysis of Miller's argument continues with Rule 32.2 of the Arkansas Rules of Criminal Procedure, which sets forth the procedure for conducting voir dire in a criminal trial:

> (a) Voir dire examination shall be conducted for the purpose of discovering bases for challenge for cause and for the purpose of gaining knowledge to enable the parties to intelligently exercise peremptory challenges. The judge shall initiate the voir dire examination by:
> (i) identifying the parties; and
> (ii) identifying the respective counsel; and
> (iii) revealing the names of those witnesses whose names have been made known to the court by the parties; and
> (iv) briefly outlining the nature of the case.
>
> (b) The judge shall then put to the prospective jurors any question which he thinks necessary touching their qualifications to serve as jurors in the cause on trial. *The judge shall also permit such additional questions by the defendant or his attorney and the prosecuting attorney as the judge deems reasonable and proper.*

Ark. R.Crim. P. 32.2 (2009) (emphasis added). The law in Arkansas thus clearly states that it is the trial court, rather than counsel for the State or the defense, that has the right to ask questions of the venire persons, and that it is a matter within the trial court's discretion whether to allow counsel to ask additional questions as the court deems reasonable or proper. Ark.

R.Crim. P. 32.2(b); *see Thessing v. State,* 365 Ark. 384, 230 S.W.3d 526 (2006); *see also Isom v. State,* 356 Ark. 156, 148 S.W.3d 257 (2004). In *Thessing,* this court upheld a trial court's refusal to allow defense counsel to ask rehabilitative questions to prospective jurors after the State "challenged those jurors for cause on whether they could impose the death penalty under certain circumstances." *Thessing,* 365 Ark. at 391, 230 S.W.3d at 533. In addition, the Court of Appeals for the Eighth Circuit has upheld the removal of a prospective juror in a death-sentence case based upon that prospective juror's written answers to a questionnaire expressing strong views against the death penalty. *United States v. Purkey,* 428 F.3d 738 (8th Cir.2005).

The extent and scope of voir dire examination is within the sound discretion of the circuit court, and the latitude of that discretion is wide. *Isom,* 356 Ark. 156, 148 S.W.3d 257. We do not reverse the circuit court's restriction of voir dire examination unless that discretion is clearly abused. *Id.* Abuse of discretion occurs when the circuit court acts arbitrarily or groundlessly. *Id.* The fact that the Rules allow the circuit court to permit such additional questioning as he or she deems proper underscores the discretion vested in the circuit court. *Thessing,* 365 Ark. 384, 230 S.W.3d 526. Moreover, we note that "in capital cases, no less than in noncapital cases, the Constitution does not dictate a particular voir dire process; it demands only that the process be 'adequate ... to identify unqualified jurors.'" *United States v. Quinones,* 511 F.3d 289, 301 (2d Cir.2007) (quoting *Morgan v. Illinois,* 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992)).

The record before us is replete with evidence demonstrating that the trial court did not act with an abuse of discretion.

The trial court held two hearings where the questionnaire was discussed at length. The trial court considered input from both the defense and the State, and made some modifications at counsel's request, but ultimately used the ten-page questionnaire over Miller's objection. Notably, the questionnaire contained a statement that the answers given were truthful to the same effect as if sworn under oath in open court. Given these actions by the trial court, coupled with the absence of a per se requirement under either state or federal law that voir dire by counsel occur, we simply cannot find an abuse of discretion.

Because we find no abuse of discretion and therefore no error, we need not consider the State's contention that Miller cannot demonstrate prejudice on this issue due to his failure to identify any juror that was wrongly seated on his jury or by his statement that he was "[r]eady, Your Honor," when asked by the trial court if the jury was "good for the Defense."

## C. Competency to Stand Trial

Miller contends that the trial court committed reversible error by failing to make a ruling on his competency to stand trial. Arkansas Code Annotated § 5-2-309 (Repl.2006) provides that if a defendant's fitness to proceed becomes an issue, the defendant's fitness to proceed shall be determined by the court. To support his allegation that his capacity to stand trial, or his fitness to proceed, was in issue, Miller refers to a pretrial motion he filed, wherein he raised the affirmative defense of lack of capacity pursuant to Ark.Code Ann. § 5-2-312 (Repl.2006). In this motion, Miller stated his intent to present evidence at trial showing that, "at the time of the events which took place, [Miller] as a result of *mental disease or defect,* lacked the capacity to conform his

conduct to the requirements of the law or to appreciate the criminality of his conduct." This motion is silent, however, with respect to the issue of Miller's competency to stand trial.

The record before us reveals that Miller's competency to stand trial was never in issue. Although Miller did raise the issue of his lack of capacity at the time of the alleged offenses due to mental disease or defect, as well as the issue of his mental retardation, these are two issues separate and distinct from the issue of capacity to stand trial. *See Weston v. State,* 366 Ark. 265, 234 S.W.3d 848 (2006) (stating that raising the issue of mental retardation does not also raise the issue of capacity to stand trial and preserve it for appellate review). Not only did Miller fail to place his competency to stand trial in issue, his competency to stand trial was never disputed. Four experts evaluated Miller. One of those, Dr. Daniel Johnson, did not make a finding as to Miller's competency. The remaining three experts concluded that Miller was competent to stand trial. When one of those three, Dr. Paul L. Deyoub, began to testify at trial about giving Miller a competency evaluation, Miller's counsel objected, stating "[i]t's not relevant. Competent to stand trial, he's standing trial."

Since Miller's competency to stand trial was never in dispute, and since Miller acknowledged his competency at trial, the trial court did not err in failing to rule on Miller's competency.

## D. *Mental Retardation*

■ Miller contends that, based upon the preponderance of the evidence he presented, both the trial court and the jury erred in concluding that he was not mentally retarded. He argues that he presented undisputed evidence that he had academic deficiencies and adaptive-behavior deficits prior to age eighteen, and that he therefore met his burden of proving mental retardation.

■ It is a violation of the Eighth Amendment's protection from cruel and unusual punishment to execute a person who is mentally retarded. *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Arkansas law likewise prohibits a death sentence for anyone who is mentally retarded at the time of an offense. Ark.Code Ann. § 5–4–618(b) (Repl.2006). This court has stated as follows:

> According to Ark.Code Ann. § 5–4–618(b), "[n]o defendant with mental retardation at the time of committing capital murder shall be sentenced to death." This provision was enacted by Act 420 of 1993. The statute provides that the defendant "has the burden of proving mental retardation at the time of committing the offense by a preponderance of the evidence." § 5–4–618(c). A defendant is entitled to a rebuttable presumption of mental retardation if his intelligence quotient ("IQ") is 65 or below, § 5–4–618(a)(2), but the definition of "mental retardation" encompasses more than an IQ score. The statute defines mental retardation as follows:
>
> > (A) Significantly subaverage general intellectual functioning accompanied by significant deficits or impairments in adaptive functioning manifest in the developmental period, but no later than age eighteen (18); and
> >
> > (B) Deficits in adaptive behavior.
>
> § 5–4–618(a)(1)(A)–(B).

*Rankin v. State,* 329 Ark. 379, 389, 948 S.W.2d 397, 402 (1997).

Before analyzing the merits of this argument, we note Miller's contention that the standard for determining mental retardation under *Atkins,* 536 U.S. 304, 122

S.Ct. 2242, is broader than the Arkansas standard, with *Atkins* recognizing intelligence quotients of between 70 and 75 as mentally retarded. This contention is entirely without merit, as the *Atkins* court clearly stated that it is up to the states to develop "appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Atkins,* 536 U.S. at 317, 122 S.Ct. 2242 (quoting *Ford v. Wainwright,* 477 U.S. 399, 405, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)). Thus, our analysis of Miller's mental retardation is pursuant to Arkansas law. *See Anderson v. State,* 357 Ark. 180, 163 S.W.3d 333 (2004).

Two days before trial, Miller filed a motion to raise the issue of his mental retardation. The trial court held a hearing the next day, heard testimony from Miller's mother, and reviewed the experts' evaluations of Miller. The trial court determined that the expert opinions as to Miller's mental retardation were inconsistent and without a consensus. The trial court ruled that it was not clear by a preponderance of the evidence what Miller's level of intellectual functioning was, but that a great deal of forensic evidence had been presented, and therefore a question of fact was created for the jury to decide during the sentencing phase. We affirm a circuit court's finding that a defendant is not mentally retarded if it is supported by substantial evidence. *Id.; Rankin,* 329 Ark. 379, 948 S.W.2d 397.

We begin our analysis of this argument with a review of the expert evidence presented as to Miller's intelligence functioning. Dr. Deyoub conducted a Wechsler Adult Intelligence Scale—Third Edition (WAIS—III), which scored Miller's full-scale intelligence quotient at 59; however, Dr. Deyoub stated that this was not a reliable or valid measure of Miller's ability because Miller was malingering and not trying his best. Dr. Dey-

oub opined that Miller's intelligence quotient was within the range of 71 to 84. Dr. Johnson also administered the WAIS–III, noting that of importance were Miller's subtest scores of 80 for vocabulary and 85 for block design. According to Dr. Johnson, these subtest scores indicated that Miller is likely to have a low average range of general intelligence, not that he was mildly retarded. Dr. Johnson agreed that these scores were generally consistent with the range previously indicated by Dr. Deyoub. Dr. Charles H. Mallory did not test Miller's intelligence quotient, but did perform two tests designed to detect malingering. According to Dr. Mallory, Miller's results on one of those tests, the Test of Memory Malingering (TOMM), indicated an intent to give wrong answers. Dr. Kevin S. Price did not conduct a test of Miller's intelligence quotient, but did testify at trial that he agreed that Miller functioned somewhere in the range of 75 to 85, even though Miller tested lower than that. Dr. Price did, however, question the others' opinions that Miller was malingering, stating on his evaluation that "malingering is not even a remote possibility in this case."

We continue our review with the evidence presented from the experts as to Miller's adaptive functioning. Dr. Deyoub observed that Miller had held a steady job for fourteen years, had been married, and had two children of his own; he opined that this level of adaptive functioning was not consistent with an intelligence quotient of 59. Dr. Price, however, observed that while on the job Miller was supervised and protected by various family members, including Miller's grandfather and uncle, and that he was disciplined on the job numerous times. Dr. Price also pointed out that Miller's marriage had ended in divorce and that he had permanently lost custody of his children. Dr. Mallory commented that Miller's behavior

on the job was a concern to other employees and that Miller had been fired for sexual harassment. However, Dr. Mallory also commented on Miller's behavior while incarcerated, noting that he kept up with financial transactions, wrote letters, and held telephone conversations. Dr. Johnson did not express any opinion as to Miller's adaptive behavior, although he did opine that Miller could not separate reality from fantasy and diagnosed Miller with paranoid schizophrenia.

We conclude our review of the evidence presented at the hearing on Miller's motion with the testimony of Rebecca Miller, Miller's mother. She testified about Miller's school records, which showed that Miller attended special education classes from the third grade on, that he functioned at a fifth- and sixth-grade level while in the tenth grade at age sixteen years, and that he graduated early from high school with a special education diploma. On cross-examination, Mrs. Miller stated that none of the school records indicated that her son was mentally retarded. With respect to his adaptive-behavior problems, Mrs. Miller testified that her son was extremely withdrawn in school, did not make friends easily, and could not connect with other people. She stated that from about age twelve to fourteen years, Miller went through periods where he dressed and acted like various characters such as a professional basketball player and a bull rider. She also testified that Miller was unable to keep a checkbook.

As our foregoing review of the evidence indicates, although there was no consensus among the expert opinions as to exactly what Miller's intelligence quotient was, all experts agreed that it was above 65, which is the point at which the statute creates the rebuttable presumption of mental retardation. Ark.Code Ann. § 5–4–618(a)(2) (Repl.2006). In addition, there were conflicting opinions and evidence as to Miller's adaptive behavior. We conclude that the foregoing evidence constitutes substantial evidence to support the trial court's determination that Miller had not proven his mental retardation by a preponderance of the evidence, and that a fact question for the jury therefore existed to be presented during the sentencing phase.

The trial did proceed to the penalty phase and Miller did present evidence of his mental retardation at that time. However, the jury rejected such evidence and found on the special-verdict form that Miller was not mentally retarded. Because we reverse and remand for resentencing on other grounds, and because there is the possibility that during that resentencing Miller may again present evidence on his claim of mental retardation to a new jury, we need not address in detail whether the jury in the present appeal erred in rejecting Miller's claim of mental retardation. However, we note that a jury alone is to determine the weight to give the evidence that is presented to it, and may reject or accept all or any part of it that it believes to be true. *Anderson*, 357 Ark. 180, 163 S.W.3d 333.

E. *Photographs*

Next, Miller challenges the admission of approximately twenty-six crime scene and autopsy photographs as inherently prejudicial and inflammatory. He contends that the prejudicial effect of these photographs far outweighed the evidentiary value and their introduction denied him a fair trial. This point of appeal is broken into three parts. Miller first contends that collectively, the photographs were inherently prejudicial due to the fact that they were 8″ × 10″ color photographs, and that black and white photographs would have described the same thing. Second, Miller contends that certain photographs (State's

Exhibits 4, 6–11, and 24–28) were so gruesome that their probative value was outweighed by their prejudicial effect. Third, he contends further that certain photographs (State's Exhibits 4, 6, 24–28) had no relevance at all and served only to inflame the jury.

██ The argument as to size and color is raised for the first time on appeal. There was a pretrial hearing concerning photographs, wherein Miller's trial counsel made a "wholesale" objection to all photographs, stating that the court should not allow them because they were so heinous. In addition, counsel requested receipt of the photographs in "the version that is going to be introduced at trial." The trial court granted this request, requiring the State to provide the defense with the 8″ × 10″ photographs. However, Miller never objected, either at the pretrial hearing, or at trial as to the size or color of the photographs, nor did he submit any smaller or black and white photographs. Accordingly, the argument as to size and color is not preserved for our review. *Branscum v. State*, 345 Ark. 21, 43 S.W.3d 148 (2001) (stating that argument as to color photographs being less prejudicial was not preserved for appeal when not raised below).

██ As to Miller's challenge to specific photographs, we note that a court's admission of even a gruesome photograph is not an abuse of discretion if the photograph sheds light on some issue, proves a necessary element of the case, enables a witness to testify more effectively, corroborates testimony, or enables jurors to better understand testimony. *Davis v. State*, 2009 Ark. 478, 348 S.W.3d 553. Further considerations in admitting photographs include whether the photograph shows the condition of the victim's body, the probable type or location of the injuries, and the position in which the body was discovered.

*Id.* A circuit court, however, must not apply a carte blanche approach to admission of a photograph and must consider whether the photograph creates a danger of unfair prejudice that substantially outweighs its probative value. *Id.*

██ The first photograph at issue (State's Exhibit 4) is a photograph of Garrett Barr's exposed body lying in the bathtub. The State introduced another photograph that depicted the same scene (State's Exhibit 51); however, a bed sheet is covering most of the body, with the exception of a leg and foot. Thus, Miller contends that there was no reason to show the initial photograph other than to inflame the passions of the jury. Both photographs were admitted during the testimony of Detective Franklin Buddy Snell of the Fort Smith Police Department, who testified that he took the crime-scene photographs in this case. According to Detective Snell's testimony, the latter photograph depicted the body of Garrett Barr just as it was found at the crime scene—covered with the sheet, while the initial photograph depicted the condition of the victim's exposed body at the crime scene. During an in camera evidentiary discussion, the trial court ruled that, notwithstanding the graphic and unpleasant portrayals, the photographs were relevant. Based on the officer's testimony, we conclude there is no merit to Miller's argument that the only purpose of admitting the initial photograph was to inflame the jury's passion. Each of these two photographs had a distinct purpose. While the latter photograph showed the location of the body as it was found, it did not also show, as did the initial photograph, the condition of the body because the body was covered with a bed sheet. The initial photograph showed the condition of the body and therefore had a relevant, admissible purpose other than to inflame the

jury. We find no abuse of discretion in the trial court's admission of the initial photograph.

■ Miller also raises a specific challenge to some of the autopsy photographs of Garrett Barr's body. Miller concedes that one autopsy photograph (State's Exhibit 27), which shows the body of Garrett Barr on the autopsy table with his neck extended, was relevant for demonstrating the cause of death as asphyxiation due to suffocation, but challenges the admission of four other autopsy photographs (State's Exhibits 24, 25, 26, and 28), which show the body with injuries caused by heat damage that occurred postmortem. Miller argues that since he was not charged with abuse of a corpse, the postmortem injuries are not relevant and were admitted only for the purpose of inflaming the passion of the jurors.

These photographs were admissible to corroborate and help explain the testimony of Dr. Charles Hall Kokes, chief medical examiner for the State of Arkansas, that Garrett Barr was not subjected to the heat-damage injuries while he was alive. Dr. Kokes testified that these photographs showed a pattern of deep charring caused by the body coming in contact with something extremely hot, that he examined the oven from the crime scene for the purpose of determining that the pattern of injuries was indeed produced by that appliance, and that in his opinion the heat damage was a result of Garrett's body being put in that oven postmortem. While the challenged photographs do show postmortem injuries, they are nevertheless injuries to the victim's body that existed at the time the body was found. Certainly, it was relevant for the jury to hear and see which of those injuries did or did not contribute to the cause of death. The trial court ruled in camera that these challenged photographs were helpful to explain Dr.

Kokes's testimony because it would ensure that all twelve jurors formed the same mental picture pursuant to his testimony concerning Garrett. Accordingly, we cannot say the trial court abused its discretion in this regard.

■ Miller also challenges the admission of certain crime-scene and autopsy photographs of Bridgette Barr. With regard to the first challenged photograph from the crime scene, (State's Exhibit 6), which is a close-up photograph of Ms. Barr's face showing discoloration and decomposition, Miller contends that it was not necessary given that the State also had four other photographs (State's Exhibits 5, 46, 47, and 49), which showed the crime scene with respect to Ms. Barr. Thus, argues Miller, the close-up photograph had no relevance and only served to inflame the passions of the jurors. Given that these four other photographs do not show Ms. Barr's face, and given Dr. Kokes's testimony that Ms. Barr's face showed no open injuries, but did have blood present around the nose and mouth indicating a minor blunt-force trauma had occurred prior to her death, we conclude there is no merit to Miller's argument that the photograph of her face was irrelevant and unnecessary.

The remaining photographs challenged by Miller (State's Exhibits 7–12) are autopsy photographs of Ms. Barr showing her body in a decomposed state with skin sloughing from her body. Miller contends that although Dr. Kokes testified that these photographs showed that Ms. Barr died as a result of strangulation with no evidence of a hard ligature, he could have so testified without the need to show these gruesome pictures. These photographs helped explain Dr. Kokes's testimony that the absence of visible marks on the neck is significant in the context of a victim who has been strangled in order to rule out the

possibility of the use of a hard ligature such as a rope or cord to produce the strangulation. Moreover, these photographs show the victim's neck from all angles. As they were helpful to explain Dr. Kokes's testimony, they were admitted without an abuse of discretion.

In summary, our review of the record shows that the trial court considered the admission of each photograph and ruled that they were admissible notwithstanding the graphic nature and unpleasant portrayals. Given our state's case law allowing even gruesome photographs to be admitted if they are helpful to explain or corroborate testimony, we find no abuse of discretion in such rulings.

*F. Expert Testimony Pursuant to Arkansas Rule of Evidence 703.*

Miller argues that the trial court abused its discretion by allowing Drs. Deyoub and Mallory to relate hearsay information of Miller's prior violent acts and employment problems that were contained in their reports. Miller asserts that because he was sentenced to death, he has demonstrated prejudice as a result of this alleged abuse of discretion. The State responds that the trial court agreed in large part with Miller's objections, and that the rulings that were unfavorable to Miller were within the trial court's sound discretion because the experts used the alleged hearsay information to explain the bases for their opinions pursuant to Rule 703 of the Arkansas Rules of Evidence.

Miller moved for a mistrial during the testimony of Dr. Deyoub, arguing that his testimony was hearsay, went beyond the scope of rebuttal, and also violated his right to confront witnesses. The trial court ruled that Dr. Deyoub's report would not be published to the jury, noting that the jury had not yet seen the report, but denied the request for a mistrial. Miller

then requested a cautionary instruction, which the trial court denied, ruling that Miller had opened the door to the challenged subject matter through the testimony of Dr. Price. During the testimony of Dr. Mallory, Miller twice objected on hearsay grounds, and the trial court ruled that although Dr. Mallory could rely on information he obtained from Miller's coworkers, he could not relate that information to the jury. The trial court also ruled that only the first two pages of Dr. Mallory's report, which were a summary, would be admitted into evidence.

Rule 703 governs the basis of opinion testimony by experts and provides as follows:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

When applying Rule 703, this court has observed that

> Rule 703 allows "an expert [to] render an opinion based on facts and data otherwise inadmissible, including hearsay, as long as they are of a type reasonably relied upon by experts in the field." *Goff v. State,* 329 Ark. 513, 521, 953 S.W.2d 38, 42 (1997). Furthermore, when a statement, such as expert testimony, "is admitted for a legitimate, nonhearsay purpose, that is, not to prove the truth of the assertions therein, the statement is not hearsay under the traditional rules of evidence and the nonhearsay aspect raises no confrontation-clause concerns." *Dednam [v. State,* 360 Ark. 240, 248, 200 S.W.3d 875, 880 (2005) ]. Lastly, the appellant must demonstrate that he has been prejudiced,

beyond the bare assertion of his right to confront the witness, by the denial of cross-examination or that such request would have availed him anything. *Marta [v. State]*, 336 Ark. 67, 983 S.W.2d 924 [ (1990) ].

*Sauerwin v. State,* 363 Ark. 324, 327–28, 214 S.W.3d 266, 269 (2005).

■ The admissibility of evidence rests in the broad discretion of the trial court. *Id.* This court will not reverse a trial court's ruling on the admissibility of expert testimony or on a hearsay question unless the appellant can show an abuse of that court's discretion. *Id.* To qualify as an abuse of discretion, the trial court must have acted improvidently, thoughtlessly, or without due consideration. *Id.* Additionally, this court will not reverse an evidentiary ruling absent a showing of prejudice. *Id.*

This record does not demonstrate an abuse of discretion on the trial court's part. The trial court carefully considered the objections, applied the correct interpretation of Rule 703, and actually made rulings favorable to Miller, such as not allowing Dr. Deyoub's written report to be published to the jury. While the trial court did allow Dr. Deyoub to testify as to Miller's previous acts of violence, that testimony was allowed because the doctor stated that having such background information was "critical" in rendering a forensic evaluation because it indicated any behavioral patterns and any actions taken in the past. This is permissible under Rule 703, so there was no abuse of discretion with respect to Dr. Deyoub's testimony. Dr. Mallory testified about information he had obtained from Miller's coworkers concerning his job performance. The trial court ruled that the doctor could rely on that information, but could not relate hearsay to the jury. Thus, Miller cannot demonstrate an abuse of discretion with respect to Dr. Mallory.

## G. *Improper Rebuttal Testimony—Telephone Calls*

■ Miller contends the trial court erred in allowing the State to introduce rebuttal testimony concerning two telephone calls Miller made from jail to his grandmother. Two calls made on December 13, 2007, and February 25, 2008, were played for the jury and transcripts of the calls were admitted as exhibits. On appeal, Miller argues that because these phone calls were made approximately one year or more after the homicides, they were not relevant to his state of mind at the time the murders were committed. He also argues on appeal that this evidence was not proper rebuttal because it was not responsive to any evidence presented by the defense.

■ At trial, Miller objected to the transcripts of the calls on the basis that they were hearsay, an official record that was transcribed by someone other than a certified court reporter, and selective of the numerous such calls recorded. While Miller did inquire as to what the calls were offered to rebut, he never objected on the basis that the calls were improper rebuttal or too remote in time to be relevant to his state of mind at the time the murders were committed. An appellant cannot change the nature and scope of his argument on appeal, but is bound by the extent and character of the objections and arguments presented at trial. *Tester v. State,* 342 Ark. 549, 30 S.W.3d 99 (2000). Miller's argument on appeal was not raised below, and therefore is not preserved for appellate review. *Green v. State,* 365 Ark. 478, 231 S.W.3d 638 (2006).

## H. *Instruction on Voluntary Intoxication*

■ Miller argues that the circuit court erred in giving Arkansas Model Jury

Instruction—Criminal 605.1 (2d ed.2008) at the conclusion of the guilt phase of the trial, which informs the jury that "[v]oluntary intoxication is not a defense to any criminal offense in Arkansas." Miller contends that the instruction should not have been given because he never asserted voluntary intoxication as an affirmative defense and because any evidence of him being intoxicated from "huffing" paint and glue was at a time after the murders were committed. Miller argues further that the giving of this instruction at the conclusion of the guilt phase contradicted the penalty-phase instruction concerning the statutory mitigating factor that the murders were committed while his capacity was impaired by mental disease or defect, intoxication, or drug use. We need not address this penalty-phase aspect of his argument, however, as we reverse and remand for resentencing on another issue and this issue will not arise on remand. Our review of this issue is thus limited to the guilt-phase aspect of his argument.

A party is entitled to a jury instruction when it is a correct statement of the law and when there is some basis in the evidence to support giving the instruction. *Vidos v. State*, 367 Ark. 296, 239 S.W.3d 467 (2006). We will not reverse a circuit court's decision to give an instruction unless the court abused its discretion. *Id.* This court has held that the instruction currently being challenged is properly given when there is evidence that the accused was voluntarily intoxicated on the day the crimes occurred. *See Standridge v. State*, 329 Ark. 473, 951 S.W.2d 299 (1997). During discussions of jury instructions to be given for the guilt phase of the trial, the State tendered AMI Crim.2d 605.1 and Miller objected on the basis that he had not raised voluntary intoxication as a defense. The trial court recalled that there had been

a lot of testimony with regard to Mr. Miller's consuming different kinds of drugs at different times and nothing is in concrete with regard to that and so to make sure that the Jury understands the law and since they are going to be finders of fact, I'm going to read that Instruction. Your objection will be duly noted.

Our review of the record reveals that Miller testified that on the night of the murders Ms. Barr was "smoking weed" and gave him some pills and told him to chew them up because they would make him feel better. Dr. Price testified for the defense that Miller had taken "a bunch of Xanax at some point before the tragedy occurred." In addition, as Miller points out, there was evidence presented that Miller was "huffing" paint and glue after the murders occurred. We conclude that the foregoing evidence is sufficient to warrant the giving of the challenged model instruction, and the trial court did not abuse its discretion in this regard.

Our review of errors alleged to have occurred during the guilt phase of the trial is now complete. For the aforementioned reasons, we conclude no error occurred in the guilt phase of Miller's trial, and accordingly affirm the judgment of convictions for three counts of capital murder. We now consider the errors Miller's Rule 10 counsel alleges occurred during the penalty phase of the trial.

## II. Penalty–Phase Issues

### A. Victim–Impact Witnesses Improperly Recommended Death Sentence

For his first assignment of error in the penalty phase, Miller contends the trial court erred in allowing two victim-impact witnesses to tell the jury that they wanted Miller to receive the death sentence. Miller points out that the requests for the

death sentence from the members of the victims' family was further referenced by the prosecutor in his penalty-phase closing argument. Miller asserts that this violated his Eighth Amendment right to a fair trial and his Fourteenth Amendment due-process rights under *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

The State concedes that the challenged evidence was admitted in error, but contends that this point is procedurally barred from our review because Miller did not make the specific objection below that he now argues on appeal. Alternatively, the State contends this was $|_{32}$harmless error. Miller replies that because victim-impact evidence is neither an aggravating nor a mitigating circumstance, but is simply additional evidence used by a jury in considering whether a sentence of death is warranted, this court cannot conduct a harmless-error review. Miller further asserts that this issue is subject to review by this court pursuant to *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980).

The State called two witnesses to present victim-impact testimony. They were Ray Barr, the father of Garrett and Sydney Barr, and Linda McCormack, Mr. Barr's mother and the children's grandmother. Both witnesses testified by reading their written statements to the jury. Ms. McCormack specifically asked the jury to "please sentence James Aaron Miller to the death penalty." Mr. Barr stated that Miller "chose his own destiny" by choosing to take the lives of Sydney and Garret, and that "[t]he death penalty is not even close to enough punishment for what [Miller] has done to my children, my family and myself."

■ We must first address the State's assertion that we are precluded from addressing the merits of this argument because Miller did not object on the specific

basis that he now argues on appeal. Our review of the record reveals that Miller filed a pretrial motion requesting the trial court to disallow victim-impact evidence. The record further reveals that at the conclusion of in camera discussions concerning jury instructions for the penalty phase, Miller's counsel stated the following objection:

> [W]ith regard to these victim impact statements . . . we would renew our motions with regard to the introduction of these statements or even additional statements of any of the witnesses who are seeking to demonstrate some aggravations or for whatever intent they intend to offer it. I would recite that these victim impact $|_{33}$statements that we've just been handed certainly are intended to inflame the Jury in a prejudicial manner and are intended to have the Jury ignore what the Court will instruct them to do and to ignore the facts and to have their emotional side making this decision and such, Your Honor, that is an unconstitutional violation of due process. It violates the Defendant's right to a fair trial and we object to same.

The trial court denied the motion, and the case proceeded with the opening statements of the penalty phase. When the State sought to introduce Ms. McCormack's written statement and testimony, Miller's counsel stated "same objection," and the trial court admitted the statement "subject to your previously made objection." This same colloquy was repeated with respect to Mr. Barr's written statement and testimony.

While this record demonstrates that Miller did make a contemporaneous objection, we agree with the State that his objection was not on the specific basis that he now argues on appeal, namely that the testimony and statements contained improper re-

quests to impose the death sentence. This court has previously applied the specific, contemporaneous objection rule to victim-impact testimony. *Williams v. State,* 347 Ark. 728, 67 S.W.3d 548 (2002). Nevertheless, given our case law that strongly prohibits such requests and comments from victim-impact witnesses, we are of the opinion that Rule 10(b)(v) requires our review of this issue, despite the lack of a specific contemporaneous objection, as one in which "the trial court erred in failing to take notice of an evidentiary error that affected a substantial right of the defendant." Rule 10(b)(vii) also requires our review of this issue as one in which "the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor."

■ ₃₄Turning now to the merits of this argument, we note that in *Greene v. State,* 343 Ark. 526, 37 S.W.3d 579 (2001), this court held that it was not proper for witnesses to tell the jury what the appropriate penalty should be. This court stated, "[w]e conclude that penalty recommendations from family members of the victim are not relevant as victim-impact evidence." *Id.* at 535, 37 S.W.3d at 586. Key to this conclusion was this court's observation that such testimony would interfere with and be irrelevant to a jury's decision on punishment. Thus, based on *Greene,* we conclude, as the State concedes, that it was error for Ray Barr and Linda McCormack to testify that they desired the jury to impose the death sentence. We further conclude that this testimony was clearly contrary to *Payne,* 501 U.S. 808, 111 S.Ct. 2597, and resulted in a violation of Miller's Eighth Amendment rights. Family members of the victim may testify about the victim and the emotional impact of the victim's death on the family; however, they may not state "characterizations and opinions about the crime, the defendant,

and the appropriate sentence." *Parker v. Bowersox,* 188 F.3d 923, 931 (8th Cir.1999) (quoting *Payne,* 501 U.S. at 830 n. 2, 111 S.Ct. 2597).

■ We must now address the State's contention that such error was harmless. In support of this contention, the State argues that Ark.Code Ann. § 5–4–603(d)–(e) (Supp.2009), allows this court to engage in a harmless-error analysis in the sentencing phase of a death-penalty trial and to affirm the death sentence if it concludes that the error would not have changed the jury's decision to impose the death penalty. We disagree with this overly simple interpretation of the statute. Section 5–4–603(d)–(e) mandates that this court conduct a ₃₅harmless-error review of a death sentence when the jury erred in finding the existence of any aggravating circumstance for any reason and found no mitigating circumstance. As the present allegation of error does not challenge the jury's conclusions as to aggravating circumstances, section 5–4–603(d)–(e) is not applicable.

Also in support of its contention that this error was harmless, the State cites us to *Nance v. State,* 339 Ark. 192, 4 S.W.3d 501 (1999), wherein this court conducted a harmless-error review under somewhat similar circumstances to the present case—victim-impact testimony from the victim's mother that she wanted the jury to impose the death sentence. The State's reliance on the *Nance* decision is misplaced, however, because it was an appeal from a denial of postconviction relief under an Ark. R.Crim. P. 37 petition, where this court analyzed whether the failure to object to the mother's testimony constituted ineffective assistance of counsel.

The components of harmless-error analysis applicable to an evidentiary ruling in the guilt phase of a capital murder trial are whether there is overwhelming evi-

dence of guilt and the error is slight. *Greene v. State*, 317 Ark. 350, 878 S.W.2d 384 (1994). However, to hold as harmless an error occurring in the penalty phase of a capital murder trial that is outside the parameters of the review mandated by section 5–4–603(d)–(e), we must be able to reach the conclusion that the error was harmless beyond a reasonable doubt. *See Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) (indicating it is constitutionally permissible for a state appellate court to engage in reweighing or harmless-error analysis in capital sentencing proceedings); *see also* *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (indicating that error was harmless beyond a reasonable doubt is proper standard for federal constitutional error). We are unable to reach that conclusion in this case.

Error occurred in this case when not one but two of the victims' family members recommended to the jury that they impose the death sentence. Although there is overwhelming evidence of Miller's guilt, and although the verdict forms reflect that the jury found several aggravating factors outweighed any mitigating ones, it is a practical impossibility for us on appellate review to judge the impact on the jury's decision to impose the death sentence of these erroneously admitted requests by two of the victims' family members. The verdict forms give us some indication of what the jury concluded with respect to the aggravating and mitigating circumstances, but there is no way for us to determine the effect of the victim-impact evidence on the jury's decision to impose the death sentence. Accordingly, on the record before us, we cannot say that the jury would have imposed the death sentence absent the request from the victims' family members to do so. We cannot, therefore, say that the error was harmless beyond a reasonable doubt. We reverse

the death sentence and remand the case to the trial court to resentence Miller pursuant to the requirements of section 5–4–616.

### B. Other Penalty–Phase Issues Likely to Arise on Resentencing

In light of our holding that Miller is entitled to resentencing due to the erroneously admitted victim-impact testimony, we touch upon the remaining assertions of alleged error in the penalty phase to the extent they are likely to arise upon resentencing.

### 1. Improper Penalty–Phase Closing Argument

Here, Miller challenges for the first time on appeal remarks made by the prosecuting attorney that Miller contends were improper comments on the death sentence and remarks that were misstatements of the law concerning his alleged diminished capacity. Miller contends that these remarks, when coupled with improper guilt-phase closing argument, deprived him of his due-process right to a fair trial and fair sentencing proceeding. The first of these specific remarks in question were made in the context of the prosecuting attorney's summarization of the evidence of mitigating circumstances, and were to the effect that the jury had already rejected the evidence of Miller's mental retardation, paranoid schizophrenia, and of his mental disease or defect. Miller also challenges the prosecutor's comments that "some crimes ... are so horrific, so awful, so heinous, that the only just verdict is the ultimate penalty and that is the payment of the Defendant's life for the victims."

First, we note that Miller did not object at all during the penalty-phase closing argument. Absent a contemporaneous objection at trial, we will not review alleged errors in the State's closing argument unless they rise to a level that war-

rants the trial court to sua sponte declare a mistrial or admonish the jury. *See Anderson*, 357 Ark. 180, 163 S.W.3d 333; *see also Bowen v. State*, 322 Ark. 483, 911 S.W.2d 555 (1995). We cannot say the remarks at issue here rise to that level as they were not misstatements of the law but rather argument on the evidence. Second, we note that this court has previously declined to comment on an |₃₅alleged error in sentencing-phase closing argument, as it determined such was not an issue that was likely to arise on remand. *Daniels v. State*, 373 Ark. 536, 285 S.W.3d 205 (2008), *superseded by statute*, Act 460 of 2009, *as recognized in Heard v. State*, 2009 Ark. 546, 354 S.W.3d 49.

### 2. *Model Instruction on Mitigating Factors*

██ Miller contends for the first time on appeal that the trial court erred in submitting the model instruction on mitigating circumstances (Form 2) because it included *all six* of the circumstances listed in the statute, Ark.Code Ann. § 5–4–605 (Repl.2006), when there was no evidence presented that some of these factors were present. As an example, he points out that there was no evidence of accomplice liability in his case, that his age was thirty years so there was no evidence of his youth presented, and that since he did have a criminal record, it worked against him to have the absence of a criminal record listed as a mitigating circumstance on the instruction form. He points out that defense counsel below did not submit an instruction on mitigating circumstances that was individualized to fit his case. He contends that the instruction given should have been individualized for him to include diminished capacity, special education, and low intelligence quotient as mitigating circumstances.

Ordinarily, this argument would be precluded from appellate review as it is raised for the first time on appeal; however, we conclude that Rule 10(b)(ii) and *Wicks*, 270 Ark. 781, 606 S.W.2d 366, require our review of this issue as one concerning whether the trial court |₃₉failed in its obligation to bring to the jury's attention a matter essential to its consideration of the death penalty. *See Anderson*, 357 Ark. 180, 163 S.W.3d 333 (concluding that the erroneous completion of sentencing forms in a death case involves a matter essential to the consideration of the death penalty). Accordingly, we address this issue to the limited extent that it is likely to arise on resentencing.

In support of this argument, Miller relies on *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), stating that it is error to refuse to consider mitigating circumstances when evidence of them is presented, and *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), stating that to be constitutional, a state statute must not preclude a jury from considering any mitigating evidence that is offered by a defendant. We read these cases to speak in terms of *precluding* a jury from considering evidence of mitigating circumstances that was presented, rather than, as Miller contends, imposing an affirmative obligation on the part of a trial court to draft an individualized instruction for a defendant when none is proffered by his counsel.

The State responds that the model instruction at issue gives the jury an open-ended option to find as many other mitigating circumstances as any of the jurors believed existed. Thus, continues the State's response, when the model Form 2 was used, the jury was not necessarily precluded from considering Miller's diminished capacity, special education, and low intelligence quotient as mitigating circumstances.

In *Dansby v. State,* 319 Ark. 506, 893 S.W.2d 331 (1995), this court relied on language from *Sheridan v. State,* 313 Ark. 23, 852 S.W.2d 772 (1993), and concluded that the submission of Form 2 to a jury instead of a form proffered by the defendant was not an impermissible exclusion of relevant mitigating factors when the judge instructed the jury that they could consider any other mitigating circumstances they saw fit and write them in the blank spaces on the form. We likewise conclude that no error occurred in the giving of the model instruction in the present case. Whether prudential considerations counsel against the giving of the model instruction rather than an individualized one proffered by defense counsel will of course be a matter for both counsel to determine according to the facts and evidence as they exist on resentencing.

3. *Jury's Failure to Find Mitigating Circumstances Existed*

██ Miller contends that the jury erroneously completed the sentencing forms because it did not find that his diminished mental capacity, special education classes, and low intelligence existed as a mitigating factor. We conclude that our review is required under Rule 10(b)(ii) and *Wicks,* 270 Ark. 781, 606 S.W.2d 366, as this is an issue involving a matter essential to the jury's consideration of the death penalty. *See Anderson,* 357 Ark. 180, 163 S.W.3d 333 (concluding that the erroneous completion of sentencing forms in a death case involves a matter essential to the consideration of the death penalty). Accordingly, we address this issue to the limited extent that it is likely to arise on resentencing.

██ Because we reverse and remand the death sentences on other grounds and remand for resentencing, and because there is the possibility that during that resentencing Miller may again present evidence on his claim of diminished mental capacity and low intelligence to a new jury, we need not address in detail whether the jury in the present appeal erred in rejecting Miller's claim of mental retardation. We do note, however, that "[a] jury is not required to find a mitigating circumstance just because the defendant puts before the jury some evidence that could serve as the basis for finding the mitigating circumstance." *Williams v. State,* 369 Ark. 104, 115, 251 S.W.3d 290, 298 (2007) (quoting *Bowen,* 322 Ark. at 497, 911 S.W.2d at 561). We also note further that Miller's reliance on *Giles v. State,* 261 Ark. 413, 549 S.W.2d 479 (1977), *overruled on other grounds by Grillot v. State,* 353 Ark. 294, 107 S.W.3d 136 (2003), is misplaced. In *Giles,* this court reversed a death sentence because there was *undisputed* evidence of mental disease or defect and the jury found no mitigating circumstances. In the present case, however, despite Miller's assertion to the contrary, the evidence of Appellant's diminished mental capacity and intelligence was disputed by the experts.

This court has previously held that the jury alone determines what weight to give the evidence, and may reject it or accept all or any part of it the jurors believe to be true. *Williams,* 369 Ark. 104, 251 S.W.3d 290. Given this broad authority in the jury for determining whether mitigating circumstances exist, and given the conflicting evidence as to diminished capacity and low intelligence that was presented in this case, we cannot say that the jury erred here by failing to conclude that a mitigating circumstance existed.

III. *Wicks* Exceptions, Arkansas Rule of Appellate Procedure—Criminal 10, and Arkansas Supreme Court Rule *4–3(i)*

A. *Wicks Exceptions*

As a single point on appeal, Miller's Rule 10 counsel sets forth three issues that

he believes warrant reversal and should, pursuant to *Wicks,* 270 Ark. 781, 606 S.W.2d 366, be addressed by this court even though there was no contemporaneous objection below. Specifically, Miller's Rule 10 counsel identified the following arguments: (1) the victim-impact witnesses erroneously advocated the death sentence; (2) improper penalty-phase closing argument by the prosecuting attorney; and (3) based on questions posed by the prosecuting attorney during voir dire regarding potential jurors' ability to sentence to death in accordance with the law, the jury was organized to return a death sentence in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

 We have addressed the first two of these arguments previously in this opinion. Further review is not warranted. We touched on the *Witherspoon* argument in point I.B of this opinion, wherein we noted that the Constitution does not prohibit the states from death-qualifying juries. *Lockhart,* 476 U.S. 162, 106 S.Ct. 1758. Here, Miller contends that the prosecutor posed questions to prospective jurors regarding their ability to sentence to death in accordance with the law, and that such questions resulted in a jury organized to return a death sentence. Miller makes a general assertion here, without identifying any particular potential juror or any particular questions from the prosecutor. It is true that the Sixth Amendment's guarantee of a fair and impartial jury prohibits a state from excluding prospective jurors for stating mere objections to the death penalty or for expressing conscientious or religious beliefs against imposing the death penalty. *Witherspoon,* 391 U.S. 510, 522, 88 S.Ct. 1770. The Supreme Court, however, clarified *Witherspoon* by stating

the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. That standard is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."

*Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Accordingly, we find no merit to Miller's argument that the prosecutor's questions of the prospective jurors concerning their ability to impose a death sentence in accordance with Arkansas law resulted in a violation of his Sixth Amendment rights.

### B. Arkansas Rule of Appellate Procedure—Criminal 10

Also as a single point on appeal, Miller's Rule 10 counsel sets forth four issues that he believes warrant reversal and should, pursuant to Rule 10, be addressed by this court as part of its mandatory review of Miller's death sentence. Miller's specific Rule 10 arguments are as follows.

First, Miller repeats the same argument he raised above as his third *Wicks* exception, which is that, based on questions posed by the prosecuting attorney during voir dire regarding potential jurors' ability to sentence to death in accordance with the law, the jury was organized to return a death sentence in violation of *Witherspoon,* 391 U.S. 510, 88 S.Ct. 1770. We addressed this argument previously and found no merit.

Second, Miller claims that prior acts of violence were introduced without an instruction regarding Ark. R. Evid. 404(b) (2009). We addressed the issue of Miller's prior acts of violence in the context of expert testimony and concluded no error occurred. Miller reiterates the point now by asserting that the State commented on

his character and uncharged misconduct beginning in voir dire and ending with improper rebuttal testimony. We sufficiently addressed this point previously and concluded that no error occurred. As Miller testified at trial concerning his prior violent crimes, he cannot demonstrate any prejudice resulting from the trial court's failure to give a Rule 404(b) instruction, even if one had been requested. Accordingly, there is no merit to this point.

Third, Miller reiterates the inherently prejudicial effect of evidence concerning Garrett Barr's postmortem burns. Miller again focuses on the fact that the burns occurred postmortem and were therefore not relevant as to the cause of death. This argument presupposes that it was known that the burns occurred postmortem. In addition, this argument overlooks the fact that his body was discovered with burn injuries. The only way it can be known that the burn injuries did or did not cause Garrett's death, is through the medical examiner's testimony. Therefore the evidence that the burns occurred postmortem is relevant to eliminate the burns as a cause of death. In addition, we reject as wholly without merit Miller's contention that the hideous nature of these injuries mandated that the trial court preclude the jury from seeing and hearing evidence of it.

Fourth, Miller challenges the prosecutor's alleged misstatement of the law during the guilt-phase closing argument concerning the procedure for punishment if the jury found Miller to have a mental disease or defect. This is not the same argument Miller raised previously concerning the penalty-phase closing argument. Here Miller challenges the prosecutor's statement that if the jury finds Miller insane he will go the Arkansas State Hospital until another doctor says he is healed and can be released. This com-

ment is an accurate statement of Arkansas statutory law. Arkansas Code Annotated § 5–2–315 (Supp.2009) sets out the procedure by which a person who has been acquitted on the basis of a mental disease or defect can be released from custody if it is determined that the person has recovered from the mental disease or defect. Therefore, we conclude the challenged comment was not improper or erroneous.

## C. *Arkansas Supreme Court Rule 4–3(i)*

The State certifies in its brief that it has reviewed the entire record in this case and, although it did find it helpful to include a supplemental addendum, it did not find any issues in this case, other than those addressed by the parties, that involved error prejudicial to Miller.

## IV. *Conclusion*

Consistent with the requirements of Rule 4–3(i) and Rule 10, we have reviewed the entire record, including but not limited to any issues we stated were not preserved for review and all issues specifically enumerated by Miller's Rule 10 counsel, and we determine that no reversible error occurred in this case other than the improper requests occurring in the victim-impact statements.

The judgment of convictions for capital murder is affirmed. The sentences of death are reversed and remanded to the trial court for resentencing in accordance with section 5–4–616.

Affirmed in part; reversed and remanded in part.

HANNAH, C.J., concurs.

BOWEN, J., not participating.

JIM HANNAH, Chief Justice, concurring.

I concur in the majority's decision to reverse and remand this case for resen-

tencing. However, I write separately because I would affirm the denial of the motion to suppress on different grounds. The officers arrived at the apartment to check on Miller based on a suicide concern called in by Miller's father. Inside the apartment, the officers noticed a photograph of Miller with a woman and two young children. They also noticed a smudge or blot of dried blood on the door. There was an odor that was described by officer Derek Harwood as a "foul odor" and a "vile odor." Paramedic Aaron Cole Beauford described the odor as smelling like someone had tried to cook wild game and burned it. Paramedic Rachel Kennon described the smell as a "horrible odor" and like "burnt Spam." Officer Stephen Hutchinson testified that, he had a cold on the day he went to Miller's apartment, and could not smell odors well, but he noticed a "bathroom odor." Miller told the officers that he and his girlfriend had been fighting. These are the alleged exigent circumstances in this case.

Where a search is undertaken in the absence of a warrant, there must be probable cause and exigent circumstances. *Steinmetz v. State*, 366 Ark. 222, 225, 234 S.W.3d 302, 304 (2006). Miller failed to attack the search based on probable cause. However, he did assert there were no exigent circumstances. The majority errs in concluding that the search was proper due to exigent circumstances. "Exigent circumstances are those requiring immediate aid or action." *Mann v. State*, 357 Ark. 159, 167, 161 S.W.3d 826, 831 (2004) (quoting *Humphrey v. State*, 327 Ark. 753, 766, 940 S.W.2d 860, 867 (1997)). There was no evidence of any immediate danger to property or a person that required immediate action. While the majority holds there were exigent circumstances in that there was a concern for fire, or explosion, and the welfare of the children, the evidence does not support the conclusion. The evidence shows that there was a vile odor in the apartment and that officers had a reasonable concern children might be present. However, Officer Hutchinson testified that he never heard "sounds or anything indicating that there were children in the apartment." In this case, nothing required immediate action, and there was no reason officers could not have remained at the apartment and waited for a proper warrant before conducting the search.

Nevertheless, the denial of the motion to suppress should be affirmed because Miller gave the officers his key to lock up and implicitly consented to the officers quickly checking the apartment to assure all was well before locking the door. The victim's foot was in plain sight and would have been discovered. The court relied on exigent circumstances in error. The majority misinterprets the law, and as a consequence of that error, improperly broadens the application of exigent circumstances.