Chancey Lynn BAIRD *v.* STATE of Arkansas

CR 03-1330 182 S.W.3d 136

Supreme Court of Arkansas
Opinion delivered May 27, 2004

*James Law Firm*, by: *William O. James* and *Clay T. Buchanan*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.

Tom Glaze, Justice. ■ Appellant Chancey Baird was convicted of attempted first-degree murder and sentenced to thirty years in prison. He appealed his conviction to the Arkansas Court of Appeals, which reversed the judgment on the ground that there were no exigent circumstances supporting a warrantless entry into his home. *See Baird v. State*, 83 Ark. App. 392, 128 S.W.3d 459 (2003). We granted the State's petition for review of this decision. When we grant review following a decision by the court of appeals, we review the case as though it had been originally filed with this court. *See Zangerl v. State*, 352 Ark. 278, 100 S.W.3d 695 (2003). We affirm Baird's conviction.

On February 7, 2001, the Elm Springs Police Department received a phone call concerning a stabbing victim at the hospital. Officer Jason Hiatt first responded to the call; upon arriving at the hospital, he spoke with the victim, Jessica Gamblin. Gamblin, who had been so severely beaten and stabbed that the doctors did not think she would survive, was crying and said "it was Chancey." Officer Hiatt understood "Chancey" to mean appellant Chancey Baird, whom Hiatt had known from a prior association. Another officer present at the hospital confirmed that Gamblin was speaking of Baird.

Officer Hiatt then contacted Elm Springs Police Chief Ken Martin, and Hiatt and Martin went from the hospital to Baird's home "to look for a possible crime scene and secure it." When they arrived at the Baird house, Hiatt saw no signs of disruption. However, when the officers walked up to the front door, Hiatt saw two blood droplets on the porch that did not appear to be dry. Hiatt knocked on the door but received no response. Chief Martin then knocked harder, and the door swung open. Martin, Hiatt, and Deputy McAffe then stepped inside the house, where they saw Chancey Baird's younger brother, Brent, asleep on the couch. The officers woke Brent and asked him if he was okay. Brent replied that he was, and the officers then asked him where his father, Buddy Baird, was. Brent indicated that his father was in the other room. Officers Martin and Hiatt then went into the bedroom, where they called out to Buddy. Buddy, who was lying face down on the bed, did not respond, so Martin shook his leg until he woke up. Martin informed Buddy that Gamblin had been hurt, and that the police were looking for Chancey. Martin asked Buddy for

permission to check the trailer and garage, and Buddy told Martin he could "look wherever [he] want[ed] to."

Martin further asked Buddy where Chancey was, and Buddy replied that if he was there, he would be in his bedroom. As the officers approached Chancey's bedroom, they saw what appeared to be a bloody shirt on the hallway floor. The officers entered Chancey's room, woke him up, and immediately handcuffed him and took him into custody. After Hiatt took Chancey to the police car, Martin walked around the outside of the house to a garage. The garage door was open, and outside it Martin saw a large puddle of blood in the gravel and a drag mark with blood going into the garage. Martin then entered the garage and "scanned it, looking for other people." He saw numerous clumps of clotted blood, but did not see any other people.

In the meantime, Officer Hiatt went back to the police department and got a consent-to-search form. Hiatt returned to the Baird house, read and explained the form to Buddy, and had Buddy sign it. The officers then used the consent form to search the residence and the garage in order to find any evidence. This was about forty-five minutes after the officers had arrested Chancey and removed him from the house. Some hours later, Martin said, when the officers realized "they were going to be there a long time," they obtained a search warrant in order to fully process the scene.

Prior to trial, Chancey Baird moved to suppress the evidence seized from his home, arguing that the search was conducted in the absence of any exigent circumstances that would have given the officers justification for a warrantless search and seizure. The trial court denied Chancey's motion to suppress, finding that the initial entry into the house by the police officers was the result of exigent circumstances and permissible in this particular fact situation. In doing so, the court specifically credited Martin's testimony that he was concerned there might be other victims in the home. The court further found that, once the officers were in the house, they had the permission of the homeowner, Buddy Baird, to proceed to the bedroom where Chancey was found and subsequently arrested.

■ On appeal, Chancey first argues that the trial court erred in denying his motion to suppress the evidence seized from his house, because the officers entered his home without a warrant and without exigent circumstances to support a warrantless entry and arrest. In reviewing a circuit court's denial of a motion to

suppress evidence, we conduct a *de novo* review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court. *Davis v. State*, 351 Ark. 406, 413, 94 S.W.3d 892, 896 (2003) (citing *Ornelas v. United States*, 517 U.S. 690 (1996)).

■ This court has held that warrantless searches in private homes are presumptively unreasonable, *see Holmes v. State*, 347 Ark. 530, 65 S.W.3d 860 (2002), and the burden is on the State to prove that the warrantless activity was reasonable. *Wofford v. State*, 330 Ark. 8, 952 S.W.2d 646 (1997). However, an officer may enter a home without a warrant if the State establishes an exception to the warrant requirement. *Id.* Ark. R. Crim. P. 14.3 enumerates the circumstances in which a warrant is not required, providing in relevant part as follows:

> An officer who has reasonable cause to believe that premises . . . contain:
>
> (a) individuals in imminent danger of death or serious bodily harm;
>
> \* \* \* \*
>
> may, without a search warrant, enter and search such premises . . . , and the persons therein, to the extent reasonably necessary for the prevention of such death, bodily harm, or destruction.

■ To enter a residence or a private dwelling without a search warrant, two things must be present: probable cause *and* exigent circumstances. *Mitchell v. State*, 294 Ark. 264, 742 S.W.2d 895 (1988) (emphasis added). Probable cause is determined by applying a totality-of-the-circumstances test, and exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed. *Id.* (citing *Brinegar v. United States*, 338 U.S. 160 (1948)). Exigent circumstances are those requiring immediate aid or action, and, while there is no definite list of what constitutes exigent circumstances, several established examples include the risk of removal or destruction of

evidence, danger to the lives of police officers or others, and the hot pursuit of a suspect. *Humphrey v. State*, 327 Ark. 753, 940 S.W.2d 860 (1997); *see also Butler v. State*, 309 Ark. 211, 829 S.W.2d 412 (1992).

On appeal, Chancey argues that there was no evidence of any exigent circumstances that would have supported a warrantless entry into his home. Particularly, he contends that the testimony of the investigating officers was in conflict with regard to the blood seen outside the front door. Chancey notes that Chief Martin testified that he saw a dried blood stain on the doorframe, while Officer Hiatt stated that he believed the drops of blood were wet, and Detective Rexford, who processed the scene later, did not even notice any blood on the porch. However, any conflict in the testimony was for the trial court to resolve. *See Cox v. State*, 345 Ark. 391, 47 S.W.3d 244 (2001). Here, the trial court specifically ruled as follows:

> [I]n my judgment, the totality of the circumstances and the undisputed testimony of Chief Martin [was] that he was concerned there were other victims in the home. Whatever was on the doorframe, it appeared to him, a veteran police officer of over twenty-five years, that there was blood at that location and on those objects. The door comes open, it's not latched, and he sees a person inside who is apparently either dead or asleep. He doesn't say that but . . . the implication to me is clear that they're concerned about possible additional victims. Again the testimony doesn't outright state that they're investigating a murder, but it's clear to me by implication that these police officers felt as though a murder had been committed at this particular location. So in my judgment . . . there was reasonable or probable cause for the arrest of this defendant. That's undisputed.

The credibility of witnesses who testify at a suppression hearing is for the trial judge to determine, and this court defers to the superior position of the trial judge in matters of credibility. *Jones v. State*, 344 Ark. 682, 42 S.W.3d 536 (2001). Further, this court has held that the Fourth Amendment's "reasonableness" requirement is satisfied in the case of an emergency entry into a home "by the compelling need to . . . insure the safety of the occupants of a house when the police reasonably believe them to be in distress and in need of protection." *Wofford*, 330 Ark. at 19 (quoting *State v. Kraimer*, 99 Wis.2d 306, 298 N.W.2d 568

(1980)). On the facts of this case, the trial judge clearly made a credibility determination that Chief Martin reasonably believed that there were or could have been other victims in the house. *See Davis, supra.* Therefore, we defer to the trial judge's determination when weighing and resolving the facts and circumstances in this matter.

 Chancey also argues that the consent to search, given by his father, Buddy, was improperly obtained and could not remove the taint of the allegedly unlawful entry into the home. However, as discussed above, the warrantless entry was supported by probable cause and exigent circumstances, and therefore, because it was not unlawful, the consent obtained from Buddy Baird could not have been the "fruit of the poisonous tree," as Baird suggests.

 As a final argument under his first point on appeal, Chancey asserts that Chief Martin's warrantless search of the garage was not supported by exigent circumstances, and that it exceeded the scope of the consent given by Buddy Baird. However, as the State points out, Chief Martin only entered the garage after he saw a large puddle of blood in the gravel outside the garage, with what he called a "drag mark" of blood going into the garage. Clearly, given these circumstances, Martin had reasonable cause under Rule 14.3 to believe someone else might be injured inside the garage. Therefore, we decline to reverse the trial court's denial of Chancey's motion to suppress the physical evidence seized from the home and garage.

 In his second point on appeal, Chancey Baird asserts that the trial court erred in denying his motion to suppress the statement he gave to police. Specifically, he contends that, because the search of his home was illegal, and any evidence obtained as a result of that illegal entry, including his arrest and subsequent statements, was tainted. Here, he relies on *Wong Sun v. United States*, 371 U.S. 471 (1963), in which the Supreme Court held that evidence that "derives . . . from an unlawful entry and an unauthorized arrest" is the "fruit of official illegality" that must be suppressed.

 Chancey's argument is premised on his contention that the initial entry into his home was in violation of the Fourth Amendment, and that there were no intervening factors between the time the officers unlawfully entered into his home and the time

he gave his statements. However, as discussed above, the entry was not illegal, and, as with the issue of Buddy Baird's consent, because the entry was proper, Chancey's statements cannot have been the "fruit of the poisonous tree." Therefore, we conclude that the trial court did not err in denying Chancey Baird's motion to suppress his statement.

As a final matter, we note that the State has argued that, even assuming error occurred, such error was harmless. To conclude that a constitutional error is harmless, and does not mandate reversal, this court must conclude beyond a reasonable doubt that the error did not contribute to the verdict. *Riggs v. State*, 339 Ark. 111, 3 S.W.3d 305 (1999). The State contends here that the testimony against Baird was substantial, and further argues that, even if we were to exclude the evidence obtained by the officers — which, of course, we do not — there was sufficient evidence to convict him of attempted first-degree murder.[1]

To support its contention, the State submits that the victim, Jessica Gamblin, testified that on the night she was attacked, she had been at Chancey Baird's house most of the evening, and had gone out to the garage to get his coat. When she left, he met her halfway between the house and the garage, and as she turned to go back into the garage, he hit her in the head with a blade she had seen him pick up earlier. He continued hitting her with the blade, asking her "why [she] was narcing on him." Gamblin testified that she "thought [she] was going to die and I said Chancey, you're killing me, and he said I know you're going to die for this." Gamblin was in the hospital for over a month with her injuries, which were so severe that her left hand was nearly severed, and she had to relearn how to walk.

The State further alludes to the testimony of Jackie Blakemore who testified that, on February 7, 2001, he was at Chancey Baird's home. Blakemore stated that he went outside to look for Gamblin, and Chancey told him that he had "left her in the garage" and wanted Blakemore to go outside. Chancey did not

---

[1] A person attempts to commit an offense if he "[p]urposely engages in conduct that constitutes a substantial step in a course of conduct intended to culminate in the commission of an offense[.]" Ark. Code Ann. § 5-3-201(a)(2) (Repl. 1997). A person commits first-degree murder if, "[w]ith the purpose of cause the death of another person, he causes the death of another person." Ark. Code Ann. § 5-10-102(a)(2) (Repl. 1997).

tell Blakemore what he wanted him to do outside, but when he went out, he found Gamblin moaning and bleeding. Blakemore took Gamblin to the hospital. Blakemore also testified that he gave Baird a "deboning blade," which was the weapon used in the attack.

 Although the State's alternative argument may have some merit, we need not decide the harmless-error issue, since we hold no error occurred regarding the evidence garnered by officers in the search of the Baird home.

Affirmed.