Cite as 2021 Ark. App. 27

# ARKANSAS COURT OF APPEALS

DIVISION I

**No.**   CR-20-309

| | |
|---|---|
| | **Opinion Delivered:** January 20, 2021 |
| HARRY B. LAIRD, JR. APPELLANT | APPEAL FROM THE MONTGOMERY COUNTY CIRCUIT COURT [NO. 49CR-19-05] |
| V. | |
| STATE OF ARKANSAS APPELLEE | HONORABLE JERRY RYAN, JUDGE |
| | AFFIRMED |

## KENNETH S. HIXSON, Judge

Harry Laird appeals after he entered a conditional plea of no contest to the charge of possession of a firearm by certain persons. He was sentenced by the Montgomery County Circuit Court to supervised probation for a term of forty-eight months. On appeal, appellant's sole contention is that the circuit court erred when it denied his motion to suppress all physical evidence. We affirm.

Appellant was charged by felony information with possession of a firearm by certain persons in violation of Arkansas Code Annotated section 5-73-103 (Repl. 2016), a Class D felony. The State alleged in the information that appellant unlawfully possessed one (1) Remington .22 Model 66 rifle, one (1) Winchester Model 94 30-30 lever action rifle, and one (1) .38-caliber revolver (sometimes referred to as the "pistol"). Thereafter, appellant filed a motion to suppress physical evidence. Appellant alleged that all physical evidence seized should be suppressed as it was the result of an illegal search in violation of his Fourth

and Fourteenth Amendment rights. He alleged that the search of his home was made without his freely given voluntary consent and with the absence of any such extrinsic circumstances as to give probable cause or justify a search and seizure. Appellant additionally filed a motion to suppress any custodial statements that he made to law enforcement.

I. *Relevant Facts*

The disposition of this appeal turns on the motion to suppress the evidence. This naturally becomes a fact-intensive analysis. There were three hearings on the motion to suppress evidence. All evidence relevant to this appeal was introduced at those hearings as the appellant subsequently entered a conditional plea of no contest, and there was no trial on the merits. The first hearing was held on June 4, 2019. Kary Stovall, a dispatch operator with the Montgomery County Sheriff's Office, testified that around 8:50 p.m. on January 8, 2019, she answered a 911 call in which an unidentified female caller said, "I need a police officer." The caller did not give her name or address or state the specific nature of her emergency before the call was disconnected. Mike May, another dispatcher monitoring the 911 call with the sheriff's department, advised Stovall that the call originated from 6 Orange Blossom Road near Oden, Arkansas. Due to the disconnection, the dispatcher attempted to call back the woman. The dispatch records in evidence state: "Caller re[quested] a deputy at 6 Orange Blossom Road – Caller then broke contact. Dispatch attempted to call back x 2, goes to voice mail." Stovall called the number a third time, and there was no answer. Deputies Josh Hackney and Jessica Babbitt were dispatched to respond to the 911 call.[1]

---

[1]Kary Stovall could not recall if she or Mike May actually dispatched the deputies to 6 Orange Blossom Road.

While the deputies were en route to Orange Blossom Road near Oden, another 911 call was received by the dispatcher. The dispatch records state, "Advised female walking on side of road with bag by Orange Blossom. Approx 2 miles past ranger station." This information was forwarded to Deputies Hackney and Babbitt.

Hackney and Babbitt were in separate patrol cars and arrived in the vicinity of 6 Orange Blossom Road at 9:16 p.m. The deputies thought the two 911 calls were related and started their search for the woman walking along the road in the vicinity of Highway 88 and Orange Blossom Road. They were unsuccessful in their attempt to locate the woman. The dispatch logs state, "In area. Not locating female. . . . Unable to locate female, negative contact." Babbitt testified that they then proceeded to "the residence."[2] Stovall testified that the dispatch log indicated that the deputies arrived at the residence located at 6 Orange Blossom Road at 10:16 p.m., over an hour after the 911 calls had been received. The deputies testified that they did not know the identity of the occupants at 6 Orange Blossom Road at that time.

At the residence, the deputies encountered a gate that was closed. Hackney testified that a chain was looped around the end of the gate and attached to a post, which kept the gate closed, but the chain was not locked. Deputy Hackney testified that he did not notice a "No Trespassing" sign posted by the gate.[3] The residence was not visible from the gate. Hackney opened the gate, activated the blue lights on his patrol car, and he and Babbitt

---

[2]6 Orange Blossom Road.

[3]Appellant Laird would later testify that there was a "No Trespassing" sign by the gate.

proceeded up the driveway toward the residence. Deputy Babbitt corroborated Deputy Hackney's description of the unlocked chain at the gate and stated that she also activated her blue lights upon going through the gate. Deputy Babbitt explained that this was done to alert anyone at the residence that law enforcement officers were entering the property.[4]

Deputy Hackney testified that he was the first to arrive at the residence, and as he exited his patrol car, an unknown female, later determined to be Alanie White, came out of the residence and aimed a rifle at him. Deputy Hackney got out of his car, drew his firearm, and ordered Ms. White to lower her weapon. She complied. Deputy Babbitt testified that by the time she exited her patrol car, Ms. White had already lowered her weapon and Babbitt did not draw her firearm. Deputy Hackney testified that Ms. White's weapon was a .22 rifle and that he took the weapon from her and placed her in handcuffs while he attempted to determine the lawfulness of her conduct.[5] Ms. White informed the deputies that she lived at the house with appellant, Harry Laird, and that appellant was still inside the house. Deputy Hackney yelled for the appellant to come out of the house with his hands up, and appellant complied. Deputy Hackney testified that he did not think he had placed appellant in handcuffs at that time.

Deputy Hackney was talking with appellant on the front porch, and Deputy Babbitt was talking to Ms. White in the front yard. Deputy Hackney testified that while he was speaking to appellant, he observed a pistol on the floor of the living room. Deputy Hackney

---

[4]Deputy Babbitt further stated that the blue lights were turned off once they arrived at the residence.

[5]The .22 rifle was retained by the deputies.

4

testified more specifically that "[they were] on a porch with an awning, and we were standing under the porch, and the door was wide open. I could see a pistol laying kind of in their living room and kitchen area." Deputy Hackney asked appellant if he had any other weapons in the house. Appellant advised Deputy Hackney that he had other weapons—including the 30-30 rifle—in the house and told Deputy Hackney "exactly where the 30-30" was located. Deputy Hackney testified that he then ran appellant's name through the Arkansas Crime Information Center database and determined that appellant is a convicted felon. At that point, Deputy Hackney placed appellant under arrest and handcuffed him.

At the same time, Deputy Babbitt was conversing with Ms. White in the front yard. Deputy Babbitt advised Ms. White that the deputies were investigating two 911 calls that originated from this location. Babbitt testified that Ms. White stated that she had the .22 rifle out because Ms. White had an argument with another woman earlier in the evening and was afraid the other woman would return. Ms. White indicated that she was cold and wanted to retrieve a jacket from inside the house. Ms. White invited Deputy Babbitt to accompany her into the house to get the jacket. The jacket was lying on a couch in the living room. Deputy Babbitt testified she observed a .38 pistol lying on the living room floor. Upon exiting the residence, Deputy Babbitt advised Deputy Hackney that she observed the pistol. When appellant's counsel asked Deputy Babbitt if the "immediate threat from the other lady" had been extinguished, Deputy Babbitt responded, "No. [Ms. White] still felt threatened. She had the gun out."

After appellant was placed in Deputy Hackney's patrol car, the deputies and Ms. White went back into the house and seized the .38 pistol that was lying on the living

room floor and the 30-30 rifle located inside a closet. At that point, the deputies had three weapons in their possession: the .22 rifle seized from Ms. White, the .38 pistol recovered from the floor, and the 30-30 rifle recovered from the closet. Deputies Hackney and Babbitt gave differing accounts regarding the seizing of the .38 pistol and 30-30 rifle. Deputy Hackney testified that Ms. White gave them verbal consent to enter the house and seize the weapons. However, Deputy Babbitt testified that appellant had asked them to remove the two remaining firearms before leaving the property. The deputies admitted that written consent was never given by either appellant or Ms. White. Additionally, the deputies admitted that *Miranda* warnings were not provided before they questioned either party at the scene. The appellant was arrested and transported to the sheriff's department, and Ms. White was released and remained at the residence.

Deputies Hackney and Babbitt testified that when they arrived at the residence, they were investigating a 911 call—not any specific crime. Deputy Hackney testified why he was concerned:

> A female was asking for help. I didn't know if she was getting beat up at the time, and needed help right then, or you know, there was so many unknowns of what was happening there. It could have been a shooting, it could have been anything at that time. We didn't know what was going on at that time. . . . [We also were concerned about the disconnected call because] she could have been on the phone and a male subject, or whoever it was at the time, could have hung the phone up for her, made her hang up and then not answer again when they called. . . . I just know we got dispatched out there, and that's when I went out there.

Deputy Babbitt added, "Well, we were called to that area. She called 911. It's very odd to find someone with a rifle pointed at you after they've called 911."

Appellant testified and admitted that he lived at 6 Orange Blossom Road. He testified that the gate was not locked; rather, it was closed with a chain with one end that

was welded to a bar and the other was hung on a hook on a post. Appellant introduced a picture of a "No Trespassing" sign that he claimed was beside the gate on January 8, 2019. Finally, appellant denied that he gave officers permission to search his house. Appellant also denied that he told the deputies that he owned the guns. Appellant testified that he told the deputies that one gun was owned by Daniel Simmons and the other guns were part of his father's estate. On cross-examination, appellant was asked why the guns were out and appellant replied, "Brooke was scared."[6]

The circuit court did not make a ruling at the June 4, 2019, hearing. Instead, it gave the parties an opportunity to file posthearing briefs. Appellant filed his brief on July 5, 2019, and the State filed its response on July 16, 2019. Appellant argued that there were five distinct points during the encounter at issue in which the deputies' actions were unconstitutional: (1) when the deputies slipped the chain off the locked gate to appellant's property absent reasonable suspicion or any probable cause of any specific crime and then entered his property with blue lights engaged; (2) when the deputies approached Ms. White with weapons drawn absent reasonable suspicion or probable cause of any specific crime at her own residence; (3) when the deputies forced appellant out of his own home at gunpoint despite having no reasonable suspicion or probable cause that any particular crime had been committed; (4) when officers interrogated appellant after forcing him out of his home at gunpoint; and (5) when officers entered appellant's house without a warrant, probable cause of any crime, any exigency, or valid consent. The State responded that the circuit court should deny the motions to suppress. In relevant part to this appeal, the State claimed that

---

[6]Brooke is apparently Alanie White.

the deputies' presence at the residence was lawful as the removal of the chain to drive through the gate did not constitute a search under Arkansas Rule of Criminal Procedure 10.1 and the deputies entered the gate as part of their community-caretaking function to determine the nature of the situation surrounding the 911 call. The State further argued that appellant lacked standing to contest the seizure of the .22 rifle and that the seizure of the .38 pistol was lawful as it was in plain view.

Thereafter, a supplemental hearing was held on July 30, 2019. Appellant testified that he discovered new evidence and presented video footage from a game-trail camera that was placed outside his front door. He admitted that the camera did not pick up every moment of the encounter. Appellant explained that the video is "cued on movement," captures video "in spurts," and did not pick up every moment of this "encounter." Appellant also admitted the video clips did not show when the deputies first arrived at his house.

Appellant submitted a second posthearing brief on August 1, 2019. Appellant incorporated the arguments made in his first posthearing brief. Additionally, appellant argued that the new video footage from the game-trail camera made it clear that the deputies' chronological version of events was inaccurate.

> 5. Specifically, the file entitled "STC_0056.A VI" shows Deputy Hackney and Deputy Babbitt approaching the front door of Laird's residence immediately after their arrival. It then shows Deputy Hackney walking up to the front door, stepping onto the stoop step, and reaching his arm past the threshold of the screen door and into the house. Hackney grabs a long-barreled firearm that is laying against the wall inside the entrance to the home and pulls it out of the residence. As he does so, Hackney can be seen directing Harry Laird out of his home at gunpoint.

> 6. The footage makes clear that law enforcement entered Laird's home at the moment they arrived, pulling a firearm out and forcing Laird outside at gunpoint.

All of this occurred prior to law enforcement making contact with Ms. Alanie White, who can be seen speaking with officers on the stoop of the home in subsequent clips. This footage directly contradicts both officers' testimony from the suppression hearing that they encountered Ms. White outside the home first before ordering Laird out at gunpoint. (R. 7; R. 30). Specifically, Deputy Babbitt testified, "First, we made contact with Ms. White . . . in the front yard." (R. 30–31). Both officers testified that it was only *after* speaking with Ms. White that they ordered Laird out of the home at gunpoint. (R. 31). Further, Deputy Babbitt testified that Ms. White asked her to accompany her inside the residence to get a jacket because it was cold. However, Ms. White cannot be seen wearing a jacket in any of the clips contained in the supplemental exhibit.

7. The supplemental exhibit shows that law enforcement entered Laird's home prior to gaining any other information about the situation, which contradicted their testimony from the suppression hearing. At the point Deputy Hackney first entered Laird's home to remove the weapon, he lacked both probable cause and exigent circumstances to do so. Just as in *Davis*, this initial entry was unlawful. The motion to suppress should be granted accordingly.

8. Simply put, police are not permitted to walk into someone's home and remove both property and the homeowner at gunpoint just because they received a 9-1-1 call that geolocates to the vicinity of that location. The 9-1-1 caller merely requested a deputy; she did not note any sort of emergency situation or exigency at the home. (R. 10-11). Knocking on the door would have been sufficient. Should the court find otherwise, there was still no need for Deputy Hackney to enter the residence when he was already commanding Laird to exit with his hands up at gunpoint.

9. The supplemental exhibit makes clear that law enforcement's initial entry into Laird's residence was unreasonable under the Fourth Amendment and Arkansas law. It also shows that law enforcement's chronology of events from the suppression hearing was inaccurate at best.

On September 13, 2019, the circuit court filed its written letter ruling explaining its rationale for granting in part and denying in part appellant's motions to suppress. In relevant part to the point on appeal, the circuit court stated that it disagreed with appellant's argument that the deputies trespassed onto his property, which constituted an intrusion prohibited by the Fourth Amendment. Instead, the circuit court found that "[a]fter receiving the 9-1-1 dispatch, it appears that those officers were clearly justified, if not duty

9

bound to check on the well-being of any occupants on the property." It further disagreed with appellant that any exigency based on the initial 911 call had been extinguished between the time the deputies became aware of the call and arriving at the residence and recognized that emergency situations provided an exception to the probable-cause requirement. Therefore, the circuit court ruled that the deputies did not violate appellant's rights by driving up the driveway and approaching the residence in response to the 911 call. Next, the circuit court found that the deputies had a right to detain Ms. White, and the seizure of the .22 rifle Ms. White was pointing at them after they arrived was justified under the circumstances. Additionally, the circuit court found that the seizure of the .38 pistol was appropriate after the deputies determined that appellant is a convicted felon under the "plain view doctrine." However, the circuit court granted appellant's motions in part with respect to the 30-30 rifle and any statements appellant made in response to the deputies' questions. It found that appellant was not properly advised of his *Miranda* rights and that any consent to search the house was not freely and voluntarily given because the deputies did not advise Ms. White that she had the right to refuse consent. Finally, the circuit court noted that appellant's chronological version of events presented at the July 30, 2019, supplemental hearing which introduced the game-trail camera video "defies logic and common sense."

Thereafter, the circuit court filed a written order in accordance with its letter ruling on October 1, 2019. Specifically, the circuit court suppressed any responses appellant made to questions posed by the deputies regarding the location of the 30-30 rifle inside the residence but ruled that any "instantaneous" statements made by appellant that were not responsive to a question from law enforcement were admissible. Moreover, the circuit

10

court found that the 30–30 rifle seized must be suppressed, but it found that the .22 rifle seized from the entrance of the residence and the .38 pistol seized from inside the residence were admissible. Thus, the circuit court granted in part and denied in part appellant's motions.[7]

Yet, another supplemental hearing was held thereafter on January 7, 2020. In the meantime, appellant recalled that Deputy Hackney had, in fact, been at the 6 Orange Blossom Road residence before this incident. Deputy Hackney testified in the initial hearing that he had not previously been to this residence. Appellant testified that Deputy Hackney had investigated the suicide of appellant's father at that address two years earlier. Appellant argued that Deputy Hackney's testimony had therefore been effectively untrue and that the motion to suppress should be granted on all issues. At this third hearing, Deputy Hackney testified that he had forgotten that he had been to appellant's residence in 2016 when he was dispatched to investigate the suicide of appellant's father. Deputy Hackney further clarified that dispatch did not provide him a specific address on January 8, 2019, but instead simply stated that the 911 call originated from Orange Blossom Road. Deputy Hackney testified that appellant's residence was the first place he saw on Orange Blossom Road. Further, Deputy Hackney testified that when he investigated the suicide two or three years earlier, it had been in daylight. However, because the investigation of the 911 calls was at night, he did not recognize the residence. After this testimony, appellant's counsel requested that the circuit court change its suppression decision. However, the

_____

[7]We make no comment on whether the circuit court was correct in its ruling that the 30-30 rifle was improperly seized or whether appellant was not properly advised of his *Miranda* rights as these issues were not raised on appeal.

circuit court denied the motion, specifically finding that "[b]ased on the testimony presented and review of the Court's decision of – letter decision of December 5, 2019, I do not feel that the testimony of the officer would warrant the Court changing its decision with respect to the suppression of the evidence that the defense is requesting." Subsequently, appellant entered a conditional plea of no contest, and the circuit court sentenced appellant to serve forty-eight months of supervised probation. This appeal followed.

## II. *Standard of Review*

In reviewing a circuit court's denial of a motion to suppress, we conduct a de novo review based on the totality of the circumstances, reviewing findings of historical fact for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the circuit court and proper deference to the circuit court's findings. *Baird v. State*, 357 Ark. 508, 182 S.W.3d 136 (2004). We defer to the superior position of the circuit court to evaluate the credibility of witnesses at a suppression hearing, and any conflicts in the testimony of witnesses are for the circuit court to resolve. *Id*. We reverse only if the circuit court's ruling is clearly against the preponderance of the evidence. *Miller v. State*, 2010 Ark. 1, 362 S.W.3d 264.

The Fourth Amendment protects an individual's legitimate expectation of privacy against unreasonable searches and seizures, and entry into a dwelling in which an individual has a reasonable expectation of privacy must be viewed as illegal unless the State established the availability of an exception to the warrant requirement. *Wofford v. State*, 330 Ark. 8, 952 S.W.2d 646 (1997). Our supreme court has held that one exception to the warrant requirement occurs when, at the time of entry, there exists probable cause and exigent

12

circumstances. *Steinmetz v. State*, 366 Ark. 222, 234 S.W.3d 302 (2006). Probable cause is determined by applying a totality-of-the-circumstances test and exists when the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been or is being committed. *Id.* Exigent circumstances are those requiring immediate aid or action, and while there is no definite list of what constitutes exigent circumstances, several established examples include the risk of removal or destruction of evidence, danger to the lives of police officers or others, and the hot pursuit of a suspect. *Id.* Under appellate case law, this court may examine only those exigent circumstances that existed at the time of the entry. *Id.*

Further, Rule 14.3 of the Arkansas Rules of Criminal Procedure (2020) establishes an emergency exception to the warrant requirement and provides the following in pertinent part:

An officer who has reasonable cause to believe that premises or a vehicle contain:

(a) individuals in imminent danger of death or serious bodily harm; or

(b) things imminently likely to burn, explode, or otherwise cause death, serious bodily harm, or substantial destruction of property; or

(c) things subject to seizure which will cause or be used to cause death or serious bodily harm if their seizure is delayed;

may, without a search warrant, enter and search such premises and vehicles, and the persons therein, to the extent reasonably necessary for the prevention of such death, bodily harm, or destruction.

Our supreme court applied Rule 14.3(a) and stated that a warrantless entry into a home may be upheld under the emergency exception if the State shows that the intruding officer had

13

reasonable cause to believe that someone inside the home was in imminent danger of death or serious bodily harm. *Wofford*, 330 Ark. 8, 952 S.W.2d 646. It further explained that any search that follows the emergency entry may be upheld under Rule 14.3 if it was reasonably necessary for the prevention of such death or serious bodily harm and is strictly circumscribed by the exigencies that necessitated the emergency entry in the first place. *Id.* (citing *Mincey v. Arizona*, 437 U.S. 385 (1978)). In *Wofford*, our supreme court made it clear that the emergency exception contained in Rule 14.3 does not require an officer to have probable cause to believe a crime has been, or is being, committed on the premises. *Wofford, supra.*

Additionally, our supreme court has noted with approval the United States Supreme Court's recognition of the emergency exception to the warrant requirement in its Fourth Amendment jurisprudence. *See Steinmetz, supra; Wofford, supra* (citing *Thompson v. Louisiana*, 469 U.S. 17 (1984); *Mincey, supra*. The Supreme Court's statements of the emergency exception reiterate that the emergency exception does not depend on the officers' subjective intent or the seriousness of any crime they are investigating; rather, it requires only an objectively reasonable basis for believing that a person within the house is in need of immediate aid. *Michigan v. Fisher*, 558 U.S. 45 (2009) (per curiam). Furthermore, though "[o]fficers do not need ironclad proof of 'a likely serious, life-threatening injury' to invoke the emergency aid exception," there must be "'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger." *Id.* at 49; *see also Miller, supra.*

14

Finally, our supreme court has emphasized that during the course of conducting legitimate emergency activities, police officers may seize any evidence that is in their plain view. *See Wofford*, *supra* (quoting *Mincey v. Arizona*, 437 U.S. at 393).

### III. *Appellant's Motion to Suppress*

Although appellant's sole point on appeal is that the circuit court clearly erred in denying his motion to suppress all physical evidence, appellant lists six subpoints as to why he believes all the physical evidence should have been suppressed, specifically the .22 rifle and the .38 pistol in addition to the 30-30 rifle that the circuit court did suppress: (1) law enforcement violated his reasonable expectation of privacy because they lacked probable cause and/or reasonable suspicion to enter onto his property in the first place; (2) law enforcement's initial approach and seizure of both occupants of his residence was illegal because they had no reasonable suspicion of any crime; (3) law enforcement illegally entered his residence to seize the first weapon at issue absent probable cause or any exigency; (4) law enforcement illegally seized him from inside his residence absent probable cause and/or any exigency; (5) the deputies' warrantless entry into his residence to seize the .38 pistol was illegal in the absence of both probable cause and exigent circumstances; and (6) the State did not prove that either he or Ms. White freely and voluntarily gave the deputies unequivocal and specific consent to search his house. We affirm the circuit court's decision and address each of appellant's subpoints in turn.

15

### A. Law Enforcement Violated Appellant's Reasonable Expectation of Privacy Because They Lacked Probable Cause and/or Reasonable Suspicion to Enter onto His Property in the First Place

Appellant argues under his first subpoint that the deputies were not permitted to remove the chain on his gate, ignore the "No Trespassing" sign, and drive up his driveway because the deputies could not articulate a specific crime that they were investigating. The deputies admitted during their testimony that they were not investigating a specific crime but were instead responding to the 911 call in which a female caller stated that she needed an officer's assistance before being disconnected. Apparently, under appellant's theory, a law enforcement officer is prohibited from rendering immediate aid in response to a 911 call when the location contains a "No Trespassing" sign because the law enforcement officer would be committing trespass. This argument is unconvincing.

In *Georgia v. Randolph*, 547 U.S. 103, 118 (2006), the United States Supreme Court stated,

> No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering . . . to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur, however much a spouse or other co-tenant objected. (And since the police would then be lawfully in the premises, there is no question that they could seize any evidence in plain view or take further action supported by any consequent probable cause[.)]

As we already articulated in our standard of review, the Supreme Court's statements of the emergency exception reiterate that the emergency exception does not depend on the officers' subjective intent or the seriousness of any crime they are investigating; rather, it requires only an objectively reasonable basis for believing that a person within the house is in need of immediate aid. *Fisher, supra.* Furthermore, though "[o]fficers do not need

16

ironclad proof of 'a likely serious, life-threatening injury' to invoke the emergency aid exception," there must be " 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger." *Id.* at 49; *see also Miller, supra.* In *United States v. Najar*, 451 F.3d 710, 719 (10th Cir. 2006), the Tenth Circuit held that a 911 call that was disconnected followed by an inability to reconnect to the caller was a reasonable basis to believe that the caller was in need of emergency aid and that immediate action was required. The court further explained that

> "911 calls are the predominant means of communicating emergency situations." [*United States v.*] *Holloway*, 290 F.3d [1331,1339 (11th Cir. 2002)] (citing [*United States v.*] *Richardson*, 208 F.3d [626, 630 (7th Cir. 2000)] ("A 911 call is one of the most common–and universally recognized–means through which police and other emergency personnel learn that there is someone in a dangerous situation who urgently needs help.")). "Such calls are distinctive in that they concern contemporaneous emergency events, not general criminal behavior." *Id.*

*Najar*, 451 F.3d at 719.

Here, a female requested the assistance of an officer through a 911 call before being disconnected. Dispatch returned the call three times without reaching the caller. Dispatch had determined that the call had originated at 6 Orange Blossom Road, and we agree with the State that the deputies had an objectively reasonable basis for believing that a person at that address could be in need of immediate aid permitting them to lawfully drive up appellant's driveway in response to the 911 call. Thus, appellant's arguments under this subpoint lack merit, and we affirm.

### B. Law Enforcement's Initial Approach and Seizure of Both Occupants of His Residence as Illegal Because They Had No Reasonable Suspicion of Any Crime

Appellant's second subpoint is similar to his first. He argues that because the deputies were not investigating a specific crime, the deputies' initial contact with Ms. White and him

was illegal. Appellant is incorrect for the same reasons we explained in the first subpoint. Appellant additionally argues under this subpoint that any exigency based on the 911 call had extinguished because more than an hour had passed between the call and the deputies' arrival at his residence. Appellant provides no legal authority in support of this argument, and we will not consider arguments, even constitutional ones, that are not supported by legal authority or convincing argument. *Anderson v. State*, 2017 Ark. 357, 533 S.W.3d 64. Appellant's argument that the encounter was somehow illegal because the officers engaged their blue lights to alert any occupants that it was law enforcement approaching simply lacks merit, and the cases he cites are factually distinguishable from the case at bar. Further, this argument ignores the fact that Ms. White told Deputy Babbitt she had the .22 rifle because Ms. White had an argument with another woman earlier in the evening and was afraid the other woman would return. And appellant advised the deputy that he had the guns out because "[Ms. White] was scared."

Appellant further argues under this subpoint that because merely holding a weapon on his or her own property is not a crime under *Taff v. State*, 2018 Ark. App. 488, 562 S.W.3d 877, there was no justification to approach Ms. White "with guns drawn." He also argues that because the deputies' contact with Ms. White was illegal on that basis, any evidence seized as a result of the deputies' contact with him must be suppressed as fruit of the poisonous tree. Appellant's reliance on *Taff*, however, is misplaced. Ms. White was not "merely" in possession of a firearm as in *Taff*; she was aiming the .22 rifle at Deputy Hackney. As the circuit court correctly noted in its letter ruling, "[p]ointing a firearm at a police officer certainly would lead that officer to 'reasonably suspect' that Ms. White is

18

committing a felony [Aggravated Assault, A.C.A. § 5-13-204(a)(2)]. Under these circumstances the officers had a right to detain her pursuant to [Arkansas] Rule [of Criminal Procedure] 3.1 . . . The seizure was justified under the circumstance." Thus, appellant's arguments under this subpoint lack merit, and we affirm.

### C. Law Enforcement Illegally Entered Appellant's Residence to Seize the First Weapon at Issue Absent Probable Cause or Any Exigency

In appellant's next subpoint, he argues that the game-trail-camera footage he introduced at the first supplemental-suppression hearing showed that Deputy Hackney illegally entered his house to seize the .22 rifle immediately after his arrival without probable cause or any exigent circumstance. Appellant admitted at the supplemental hearing that the video footage was not continuous and did not show when the deputies first arrived. However, appellant nonetheless argues that contrary to the deputies' testimony that they were immediately confronted by Ms. White pointing the .22 rifle at Deputy Hackney, Deputy Hackney instead immediately walked up to the front door, stepped onto the stoop step, and reached his arm past the threshold of the open screen door into the house to grab the .22 rifle that was lying against the wall just inside the entrance. The circuit court rejected appellant's proposed chronological version of events in its letter ruling after weighing the evidence. The circuit court explained that in order to accept appellant's version of events, one would have to adopt that

> [i]mmediately upon arrival, the officers speak to no one, but proceed to the front threshold, open a screen door, retrieve a "long-barreled firearm" that is lying against the wall inside the entrance to the home without any prior knowledge of its location, much less its existence, order the Defendant out of the residence at gunpoint [with] no knowledge of who lives at the residence and immediately arrest the Defendant without any information that any crime has been committed. All of this based on undisputed information from a 9-1-1 call requesting the assistance of a police officer.

19

The circuit court found that version of events "defie[d] logic and common sense." Instead, the circuit court found that it was only logical that the .22 rifle that Deputy Hackney retrieved on the video footage was the same rifle that Ms. White had pointed at Deputy Hackney and was directed to put down according to the deputies' testimony. The video footage submitted by appellant that admittedly did not record every moment of the encounter simply did not include video footage of the deputies' encounter with Ms. White upon their arrival. It is for the circuit court to evaluate the credibility of witnesses at a suppression hearing and resolve any conflicts in the testimony of the witnesses; therefore, we affirm the circuit court's findings regarding the lawfulness of Deputy Hackney's seizure of the .22 rifle. *See Baird*, *supra*. Thus, appellant's arguments under this subpoint lack merit, and we affirm.

### D. Law Enforcement Illegally Seized Appellant from Inside His Residence Absent Probable Cause and/or Any Exigency

In appellant's fourth subpoint on appeal, he argues that because Deputy Hackney's demand that he exit his home constituted an illegal seizure of his person "under the doctrine of constructive entry" without sufficient probable cause and/or exigent circumstances, "[e]verything following law enforcement's illegal seizure of [appellant] from inside his own home must be suppressed as fruit of the poisonous tree." We disagree as appellant's arguments are misplaced.

Appellant cites a Sixth Circuit case in support of his "constructive entry" argument. *See United States v. Thomas*, 430 F.3d 274 (6th Cir. 2005). However, *Thomas* is inapplicable here. The *Thomas* court explains that the Fourth Amendment prohibits law enforcement

20

from entering a house without a warrant absent exigent circumstances. *Id.* The court goes on to explain that a consensual encounter at the doorstep may evolve into a "constructive entry" when law enforcement, while not entering the house, deploy overbearing tactics that essentially force the individual out of the home. *Id.* However, although appellant argues to the contrary, exigent circumstances still existed at the time appellant was instructed to exit the house, and Deputy Hackney's request that appellant come out of the house to speak with him was justified and not an overbearing tactic. In *Steinmetz*, *supra*, our supreme court stated that exigent circumstances are those requiring immediate aid or action, and while there is no definite list of what constitutes exigent circumstances, several established examples include the risk of removal or destruction of evidence, danger to the lives of police officers or others, and the hot pursuit of a suspect. As we already indicated above, the deputies here were lawfully responding to a 911 call that was traced to appellant's address in which a female caller requested the assistance of an officer. Upon their arrival, the deputies were confronted by Ms. White pointing a .22 rifle at Deputy Hackney. When Ms. White lowered the rifle, she informed the deputies that appellant was still inside the residence. At the time Deputy Hackney requested appellant to exit the house, the deputies were still responding to the 911 call, and Ms. White had not yet advised the deputies of the reason for the 911 call. Thus, appellant's arguments under this subpoint lack merit.

E. The Deputies' Warrantless Entry into Appellant's Residence to Seize the .38 Pistol Was Illegal in the Absence of Both Probable Cause and Exigent Circumstances

In appellant's fifth subpoint, he argues that the .38 pistol should have been suppressed because the deputies' warrantless entry into the house to seize it was unlawful in the absence of both probable cause and exigent circumstances. He more specifically argues that because

21

any exigent circumstances had dissipated by that point, the seizure was unlawful despite the fact the .38 pistol was in plain view. We disagree.

Here, Deputy Hackney testified that he observed the .38 pistol in plain view from the porch when he was talking with appellant in response to the emergency 911 call. Further, Deputy Babbitt observed the pistol in plain view when she was invited into the residence by Ms. White to retrieve a jacket. Deputy Hackney later determined that appellant is a convicted felon prohibited from possessing firearms and placed appellant under arrest. Our supreme court has emphasized that during the course of conducting legitimate emergency activities, police officers may seize any evidence that is in their plain view. *See Miller*, *supra*; *Wofford*, *supra*. Additionally, in *Owen*, we stated that pursuant to the plain-view exception to the Fourth Amendment's warrant requirement, when police officers are legitimately at a location and acting without a search warrant, they may seize an object in plain view if they have probable cause to believe that the object is either evidence of a crime, fruit of a crime, or an instrumentality of a crime. *Owen v. State*, 75 Ark. App. 39, 45, 53 S.W.3d 62, 66 (2001), *as supplemented on denial of reh'g* (Oct. 24, 2001). Moreover, despite appellant's assertion that any exigent circumstances had dissipated, exigent circumstances—the risk of removal or destruction of evidence—still existed when the .38 pistol was seized as we have previously explained. *See Steinmetz*, *supra*. Thus, appellant's arguments under this subpoint lack merit, and we affirm.

F. The State Did Not Prove That either Appellant or Ms. White Freely and Voluntarily Gave the Deputies Unequivocal and Specific Consent to Search His House

In appellant's final subpoint, he argues that the State failed to prove that either he or Ms. White freely and voluntarily gave their consent for the deputies to search the house.

However, appellant's argument is unavailing. The deputies seized three weapons. The .22 rifle was seized because Ms. White pointed the rifle at Deputy Hackney. The .38 pistol was seized because it was in plain view as previously discussed. Therefore, the only weapon seized by the deputies that ostensibly could have been the result of the deputies' failure to obtain free and voluntary consent was the 30-30 rifle that was removed from a closet. However, the record is clear that the circuit court granted appellant's motion to suppress the 30-30 rifle. Hence, appellant's argument that the deputies failed to obtain free and voluntary consent for the search does not afford appellant relief.

IV. *Conclusion*

For the reasons stated above, we reject appellant's arguments on appeal and affirm the circuit court's decision regarding appellant's motion to suppress all physical evidence.

Affirmed.

ABRAMSON and VIRDEN, JJ., agree.

*Lassiter & Cassinelli*, by: *Michael Kiel Kaiser*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Adam Jackson*, Ass't Att'y Gen., for appellee.